**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TIFFANY L. HALO, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO.: |
| | : | 3:10-cv-1949 (VLB) |
| | : | |
| v. | : | |
| | : | |
| YALE HEALTH PLAN, | : | |
| DEFENDANT. | : | MARCH 8, 2012 |

<u>MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD [DKT. #14]</u>

The Plaintiff, Tiffany L. Halo ("Halo"), proceeding *pro se*, brings this action

against Defendant Yale Health Plan ("YHP"), the student insurance provider at

Yale University, under the Employee Retirement Income Security Act of 1974

("ERISA"). Plaintiff principally alleges that Defendant violated 29 C.F.R.

§2560.530-1's provisions regarding the timing of notification of benefit

determinations. Her single count complaint can also be construed to allege a

second claim for breach of contract under ERISA. Plaintiff alleges that YHP acted

in an arbitrary and capricious manner in denying her claims for coverage of

certain out-of-network services. Defendant has moved for judgment on the

administrative record to affirm YHP's coverage decisions. For the reasons stated

hereinafter, the Defendant's motion for judgment on the administrative record is

granted as to both claims.

1

Facts

Halo was a graduate student at Yale University who was enrolled in the Yale Health Plan in 2008.  As an enrollee, Halo was entitled to health benefits under the plan as described therein.  The parties agreed that the plan administration was governed by federal law.  The issues at hand arose out of a series of incidents which began on May 31, 2008 when Halo developed a visual disturbance in her left eye.  She went to the Yale University Health Services Urgent Care Department and was referred to Yale New Haven Hospital for an inpatient consultation.  [Dkt. #14, Def.'s Mem., Ex. B, p. 2].  She was diagnosed with a retinal detachment and surgery on her left eye was performed on June 1, 2008.  [*Id.* at 4-7].  Follow up appointments were scheduled for June 2 and 9, 2008 with Dr. Huang at Yale New Haven hospital.  [*Id.* at 8-12].  On June 11, 2008, Halo was referred for a second opinion with Dr. Liggett at New England Retina Associates.  [*Id.* at 13].  It was determined that her retina had not reattached and a vitrectomy was performed on June 13, 2008.  [*Id.* at 14].  She returned the next day for a follow up and was given a cell phone number to call over the weekend if there were any further complications.  [*Id.* at 15-16].  The following Monday, June 16, 2008, Halo returned again due to severe pain in her left eye and was seen by Dr. Ligette's associate Dr. Haffner.  Dr. Haffner found that the pain was caused by an increase in intra-ocular pressure and he performed a partial aspiration to reduce it.  [*Id.* at 17-19].

On June 16, 2008, after the visit with Dr. Haffner, Halo's mother made a request by telephone to YHP for a second opinion on Halo's condition.  Within 24

hours, Dr. Forster, Chief of Ophthalmology at Yale University Health Services, called and approved the referral for a second opinion with Dr. D'Amico of Weill Cornell Ophthalmology Associates ("Weill") who was an out-of-network doctor. YHP expressly informed Halo by letter dated June 17, 2008 that any additional services beyond her visit for a second opinion must be further approved before they would be covered under the plan. [Dkt. #14, Def.'s Mem., p. 3 and Ex. C.].

On June 17, 2008, Dr. D'Amico saw Halo and determined that immediate treatment was necessary.  Halo received treatment the same day.  The Weill treatment record of Halo's June 17, 2008 visit states "Patient will move to her parents in N.J. and would like to transfer her care to WCMC."  [Dkt. # 14, Ex.B, p. 23].   Halo went to see Dr. D'Amico the next day for a follow up.  [Dkt. #14, Def.'s Mem., Ex. B, p. 20-24].  Halo alleges in her Memorandum in Opposition to Defendant's Motion for Judgment that her parents called Vicki Eisler of Member Services at YHP on June 17, 2008 to inform her that Dr. D'Amico had performed an emergency treatment.  Halo alleges that Eisler told her parents that the services provided by Dr. D'Amico were approved as emergency treatment.  Halo also alleges that her parents understood from Eisler that all treatment with Dr. D'Amico until June 30, 2008 would also be approved and covered by YHP.  [Dkt. #20, Pl.'s Mem., p. 9].  Defendant disagrees that they had authorized all services provided by Dr. D'Amico until June 30, 2008 and points out that the initial authorization was to obtain a second opinion anytime until June 30, 2008.  [Dkt. #14, Def. Mem., p. 4 n.3].  The authorization letter, dated June 17, 2008, clearly

states that YHP's approval was only for a second opinion. [Dkt. #14, Def.'s Mem., Ex. C].

During this time between June 17 and August 6, Halo alleges that she called and left numerous voicemails for YHP seeking to confirm that coverage beyond a second opinion for emergency care had been approved as Eisler had previously allegedly indicated to her parents.  [Dkt. #20, Pl's. Mem., pp. 9, 11]. Halo alleges that Shaun Peltor, the Billing Manager of Cornell Weill Ophthalmology, which is not affiliated with YHP, allegedly confirmed to her orally on June 19, 2008 that coverage had been extended by YHP until June 30, 2008. [*Id.* at 9].  However since Peltor is not an employee of YHP, Plaintiff cannot rely on her alleged conversation with Peltor to prove that YHP had approved covered for Dr. D'Amico's services.

The bills for the visits on June 17 and 18, 2008, were received by the plan's claims department on July 8, 2008 as Halo's claim for services rendered.  The claims were denied by YHP on July 30, 2008 in a form entitled "Explanation of Benefits" on the basis that the "service [was] not authorized."  [Dkt. #14, Def.'s Mem., Ex. E].  Halo returned to Dr. D'Amico for further visits on June 20, June 26 and August 5, 2008.  [Dkt. #14, Def.'s Mem., Ex. B, p. 25-38].  On the August 5 visit, Dr. D'Amico recommended further surgery to be performed eight days later on August 13, 2008.  [*Id.* at 35-38].

Halo alleges in her Memorandum in Opposition to Defendant's Motion For Judgment that Eisler finally returned her calls on August 6, 2008 and indicated that there was no official determination on whether YHP would cover any of the

services provided by Dr. D'Amico beyond the second opinion which was contrary to Halo's parents' understanding from their conversation with Eisler on June 17, 2008. [Dkt. #20, Pl.'s Mem., p. 12]. Eisler advised Halo to submit an appeal for the claims that had already been denied.

On June 20, 2008, June 26, 2008, and August 5, 2008, Halo received medical care at Weill from Dr. D'Amico. [Dkt. #14, Ex. B]. On the treatment notes for these and all subsequent visits the section entitled "Referring Physician Copy" was left blank. [*Id.*]. The June 20, 2008 treatment note indicated Halo was to "follow up in 1 week" with Dr. D'Amico of Weill. [*Id.*]. It also says "Patient voices understanding and agreement to plan as outlined." [*Id.*]. Dr. D'Amico's June 26, 2008 treatment notes states "return in two weeks (around 7/10/09)." [*Id.*]. The August 5, 2008 treatment notes indicate that Dr. D'Amico instructed Halo to "return in 7 days." [*Id.*]. On August 6, 2008 Halo completed a pre-operative questionnaire for a surgical procedure scheduled for August 13, 2008. [*Id.*].

On August 7, 2008, Halo notified YHP about the upcoming surgery scheduled for August 13, 2008 and in the same letter, appealed the decision to deny coverage for the June 17 and June 18, 2008 visits to Dr. D'Amico. [Dkt. #14, Def.'s Mem., Ex. F]. In this letter, Halo indicated that she was displeased with the treatment she had received at Yale and with Dr. Liggett. She wrote that during her June 17, 2008 visit, Dr. D'Amico "immediately noticed three problems with the surgery performed by Dr. Ligett. First, Tiffany allergic to Vycril sutures; Dr. D'Amico removed sutures, and within 24 hours, redness and irritation in the left eye had decreased by more than fifty percent. Second, Dr. D'Amico was

concerned that Tiffany may have an infection; multiple cultures were taken and allowed to grow for 48-72 hours.  Third, Tiffany's eye pressure was still greatly elevated and as a consequence Dr. D'Amico aspirated both the anterior and posterior portions of the left eye, removing > 0.5cc gas.  Tiffany felt almost immediate relief.  Dr. D'Amico also prescribed oral antibiotics for possible infection."  [*Id*.].

On August 11, 2008, Dr. Forster called Halo to advise her to stay in network in order for the plan to cover her medical expenses and indicated that YHP would not pre-authorize the August 13 scheduled surgery.  [Dkt. #14, Def.'s Mem. p. 6-7 and Ex. H].  Halo elected to undergo surgery on August 13, 2008 with Dr. D'Amico at New York Presbyterian Hospital prior to receiving authorization for the out-of-network service from YHP.  [Dkt. #14, Def.'s Mem., Ex. B, p. 43-45].  Dr. D'Amico diagnosed Halo with recurrent retinal detachment for both preoperative and post operative.  [Dkt. #14, Ex. B].

On August 15, 2008, YHP responded to Halo's appeal in a letter in which it affirmed its decision to deny her claims.  YHP stated that it would only cover the portion of the June 17 visit to Dr. D'Amico that it had pre-authorized for a second opinion but would not cover the additional services provided during the June 17, 2008 visit and the June 18, 2008 visit.  YHP indicated in the letter that "[y]ou elected to leave the New Haven area and requested coverage for a second opinion with a physician, Dr. D'Amico, in New York.  Coverage for non-emergency out of network care is not part of your health care benefit with Yale Health Plan, but we routinely do allow coverage *for consultation only* with an out-of-network

6

clinician for the purposes of obtaining a second opinion.  Your request for such a consultation was approved.  The services provided by Dr. D'Amico went beyond consultation, resulting in charges that were not covered by the original request." [Dkt. #14, Def.'s Mem., Ex. J] [emphasis in the original].  In addition, YHP indicated in the letter that it had provided "clear and explicit" communication to Halo that further visits and the follow-up surgery scheduled for August 13, 2008 with Dr. D'Amico would be denied and that Halo had been informed of the availability of in-network retinal specialists to provide her with any needed follow up care.  [*Id.*].

On September 8, 2008, Halo appealed seeking reimbursement for the services rendered by Dr. D'Amico on June 17, 18 and August 13.  [Dkt. #14, Def.'s Mem., Ex. K].  In the letter, Halo indicated that on June 17, 2008 Dr. D'Amico "removed Vicryl sutures (because she had an allergic reaction to them)" and opined that Dr. D'Amico "aspirated both the anterior and posterior chambers of her eye in order to relieve the still-elevated pressure and pain, took bacterial and fungal cultures because infection was suspected," and  stated that he "started her on an antibiotic regimen."  She further stated that "improvement of her eye over the next 24 hours was dramatic: the pain subsided, the pressure decreased to a medically acceptable level, and the scleral redness and swelling reduced significantly.  These procedures were medically necessary to protect the integrity of her eye from infection and (further) permanent damage; there were ignored by her unavailable surgeon, Dr. Liggett, and denied by covering ophthalmologist Dr. Haffner."  [*Id.*].  Halo also argues in the letter that the August 13 surgery with Dr. D'Amico was "medically necessary: the surgery entailed removal of the lens

because of a cataract that had rapidly developed from the perfluoropropane gas, removal of that gas, which still occupied between 33-50% of the volume of her eye after 8 weeks of recovery performed by Dr. Liggett, laser therapy to reattach the retina, and installation of a silicone oil bubble to stabilize recovery." Lastly Halo states that the "severity of her situation makes this claim a legitimate one." [*Id.*].

Halo was seen at Weil on September 10, 2008 on which date Dr. D'Amico scheduled a "RFD repair next Wednesday 9/17/09." [Dkt. #14, Ex. B]. Her final follow-up visit to Dr. D'Amico was on October 3, 2008. [*Id.*].

On September 18, 2008, YHP sent a letter to Halo indicating that the YHP Claims Committee met on September 9, 2008 to review the appeal and had approved payment in full for Halo's visits to Dr. D'Amico on June 17 and 18, 2008, but upheld its decision to deny payment for the surgery performed on August 13, 2008. [Dkt. #14, Def.'s Mem., Ex. L].

On September 29, 2008, Halo requested another appeal of the decision to deny reimbursement for the August 13, 2008 surgery. [Dkt. #14, Def.'s Mem., Ex. M]. In the letter, Halo simply requests for the "Committee to revisit Dr. D'Amico's surgery of August 13, 2008. [*Id.*]. On September 18, 2008, YHP sent a letter to Halo indicating that on November 4, 2008, the YHP Claims Committee reviewed her appeal and voted unanimously to deny payment for the August 13, 2008 surgery. [Dkt. #14, Def.'s Mem., Ex. N].

On September 10, 2008, Halo developed additional eye symptoms and again went to Weill Cornell Ophthalmology where she was diagnosed with a

recurrent retinal detachment.  [Dkt. #14, Def.'s Mem., Ex. B, p. 46-48].  Surgery
was scheduled for September 17, 2008 and Halo underwent the operation at New
York Presbyterian Hospital.  [*Id.* at 53].  On October 3, 2008, Halo filed a claim for
the services rendered on September 10 and the September 17 surgery.  On
November 11, 2008, YHP denied her claims for these additional services again in a
form entitled "Explanation of Benefits" on the basis that "service [was] not
authorized."  [Dkt. #14, Def.'s Mem., Ex. P and Ex. Q].  The November 11, 2008
form also shows a denial of claims for charges incurred on Plaintiff's June 20 and
26, 2008 visits to Dr. D'Amico.  [Dkt. #14, Def.'s Mem., Ex. Q].  On December 13,
2010, Plaintiff filed the instant action in federal court.

　　　　The provisions of the health plan in which Halo was enrolled and which
define the coverage afforded are explained fully in the YHP Student Handbook.
*See* [Dkt. #14, Def.'s Mem., Ex. A].  The plan provides that "[i]f in the course of
medical evaluation and treatment, a member requires outpatient services not
provided at YUHS, the member's primary care clinician may make a referral to an
approved specialist in the YHP health care network outside YUHS.   Prior
authorization for coverage of these services must be obtained from the YHP Care
Coordination Department.  A referral from your primary care clinician is
necessary but does not constitute authorization for coverage.   Authorization for
coverage must be obtained from the Care Coordination Department.  Approved
claims are covered at 100%.  Please note that YHP will not pay for the services of
non-YHP network clinician unless those services, including all testing and
treatment ordered by the non-network clinician, are authorized in advance by the

9

YHP Care Coordination Department. This is true even if the member was referred for services by a YHP network clinician, except in cases of emergencies." [*Id.*].

The plan also provides that "[i]n general, outpatient care received out of YHP network of health care clinicians and facilities is not covered under YHP Hospitalization/Specialty Coverage.  The two exceptions to this are outpatient care for an emergency or urgent condition … and care that has been arranged in advance by a YHP clinician and approved by the Care Coordination Department. In special circumstances when a medical condition or therapy may require some out-of-network case, a YHP clinician will case manage your condition, which means that the clinician will coordinate in advance medically necessary care out of network and assist in arranging for the pre-authorization of this care.  Case managed care is covered out-of-network only when care is coordinated in advance by a YHP clinician and authorized in advance by the Care Coordination Department."  [*Id.*].

Under the plan, "[e]mergency care and pre-authorized follow-up care for emergency conditions are covered at 100% regardless of location.  An emergency condition is defined as a major acute medical problem or major acute trauma that requires immediate medical attention or a condition that could lead to serious harm or death if care is not received or is delayed."  Plan beneficiaries are instructed to "contact YHP Care Coordination Department within 38 hours (or 2 business days) of receiving emergency outpatient treatment or being admitted to an emergency facilities.  The Care Coordination Department will (1) notify YHP clinical staff of your condition so that they can coordinate your care as

appropriate or make any further arrangement for your care and (2) pre-authorize any necessary follow-up care.  Follow-up care that is not pre-authorized may be denied.  If YHP deems it appropriate, YHP may arrange for and cover the expenses of transporting you to a YHP-approved facility to receive follow-up care. If the severity of your medical condition prevents you or your representative from contacting YHP Care Coordination Department within 48 hours, you will still be covered for the emergency, but you should contact Care Coordination as soon as possible." [*Id.*].   The Plan further provides that "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied.  This includes all elective admissions or treatments.  Coverage will also be denied for condition that could have been treated at YUHS but were not while the student or enrolled dependent was in area."  [*Id.*].

Under the plan, "[u]rgent care is covered at 100% when it is received at the Urgent Care Department at YUHS.  An urgent condition is defined as he sudden and unexpected onset of an acute medical problem or trauma that requires immediate medical attention.  Care for nonacute phases of chronic conditions, maintenance care, and routine care are not considered urgent.  If you are away from New Haven County you are considered out of area and you may receive urgent care at any medical facility and receive the same coverage as for emergency care, including pre-authorized short-term follow-up care.  In other words, no distinction is made in coverage is made in coverage between urgent care and emergency care received out of the area; the distinction between urgent

care and emergency care applies only when you are within New Haven County. You should contact the YHP Care Coordination Department within 48 hours (or 2 business days) of any care received out of area for an urgent condition to ensure that YHP clinical staff are aware of your condition and to request the Care Coordination Department to pre-authorize follow-up care.  Follow-up care that is not pre-authorized may be denied.  If, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied.  This includes all elective admissions or treatments.  Coverage will also be denied for conditions that could have been treated at YUHS but were not while the student or enrolled dependent was in area." [*Id.*].

Lastly, the Plan provides that "YHP may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of the policies and coverage plans described in the student handbook."  [*Id.*].

The administration of the plan is also subject to ERISA and the regulations promulgated thereunder. [1]  29 C.F.R. §2560.530-1 "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. §2560.530-1(f)(1).  It provides that in general "if a claim is wholly or partially denied, the plan administrator shall notify the claimant … of the plan's adverse benefit determination within a

---

[1] The plan expressly indicates that "[p]articipants and beneficiaries in the Yale Health Plan are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)" and that "[i]f a claim for coverage is denied or ignored, in whole or in part, a participant may file suit in state or federal court."  [Dkt. #14, Ex. A].

12

reasonable period of time, but not later than 90 days after receipt of the claim by the plan." 29 C.F.R. §2560.530-1(f)(1).  In connection with urgent care claims, "the plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claim by the plan, unless the claimant fails to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the plan.  In the case of such a failure, the plan administrator shall notify the claimant as soon as possible, but not later than 24 hours after receipt of the claim by the plan, of the specific information necessary to complete the claim.  The claimant shall be afforded a reasonable amount of time, taking into account the circumstances, but not less than 48 hours, to provide the specified information."  29 C.F.R. §2560.530-1(f)(2)(i).

Under 29 C.F.R. §2560.530-1(f)(iii) in connection with pre-service claims, "the plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 15–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." 29 C.F.R. §2560.530-1(f)(iii)(A).  In connection with

post-service claims, "the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." 29 C.F.R. §2560.530-1(f)(iii)(B).

Under 29 C.F.R. §2560.530-1(g), the administrator is required to provide a written or electronic notification of any adverse benefit determination and that the notification shall set forth "in a manner calculated to be understood by the claimant (i) the specific reason or reasons for the adverse determination [and] (ii) Reference to the specific plan provisions on which the determination is based." *Id.* In addition, 29 C.F.R. §2560.530-1(h) provides that the administrator shall provide a "full and fair" review on an appeal of adverse benefit determinations that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." Lastly under 29 C.F.R. §2560.530-1(j), the administrator shall provide the claimant with written or electronic notification of a plan's benefit determination on appeal that shall set forth "in a manner calculated to be understood by the claimant (i) the specific reason or reasons for the adverse determination [and] (ii) Reference to the specific plan provisions on which the determination is based."

14

**Legal Standard**

While a motion for judgment on the administrative record is a motion that "does not appear to be authorized in the Federal Rules of Civil Procedure," courts treat such motions as motions for summary judgment. *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d. Cir. 2003); *see also Guglielmi v. Northwestern Mutual Life Ins. Co.*, No. 06-CV-3431, 2007 WL 1975480, at *3 (S.D.N.Y. July 6, 2007); *Chitou v. Unum Provident Corp.,* No. 05-CV-8119, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007); *Pava v. Hartford Life and Accident Ins. Co.*, No. 03-CV-2609, 2005 WL 2039192, at *6 (E.D.N.Y. August 24, 2005); *Perezaj v. Bldg. Serv. 32B-J Pension Fund*, No. CV-04-3768, 2005 WL 1993392 at *4 (E.D.N.Y. Aug.17, 2005); *Katzenberg v. First Fortis Life Ins. Co.*, No. 05-CV-1146, 2007 WL 1541468, at *14 (E.D.N.Y. May 25, 2007); *Charles v. First Unum Life Ins. Co.*, No. 02-CV-0748E, 2004 WL 963907, at *1 (W.D.N.Y. March 26, 2004).

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-

15

moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

ERISA jurisprudence determines the standard and scope of review in connection with a challenge to a plan's denial of benefits. *Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869 at *6 (S.D.N.Y. 2007). "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996). However, after analyzing the legislative history of ERISA, the Supreme Court has held that a denial of benefits challenge is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 111-12 (2d. Cir. 1995); *Murphy v. IBM Corp.*, 23 F.3d 719, 721 (2d Cir. 1994) (per curiam), *cert. denied*, 513 U.S. 876 (1994); *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 829 (1983).

In order to determine if a plan confers discretionary authority on its administrator(s), the Second Circuit has held that discretionary authority can be granted without specific trigger words such as "discretion" or "deference," as long as the benefit plan's language is clear. *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005). In general, objective standards do not grant discretion while subjective standards do. The Second Circuit has

instructed that subjective phrases such as "resolve all disputes and ambiguities" or "in our judgment" clearly confer discretionary authority. *Id.*; *see also Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-23 (2d Cir. 2008) (finding that terms such as "may adopt reasonable policies, procedures, rules, and interpretations" and "determine[s] to be the reasonable charge" confer discretionary authority).

However, the Second Circuit has explained that a requirement to "submit satisfactory proof of Total Disability" is ambiguous and does not clearly confer discretionary authority. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251-52 (2d Cir. 1999). The Second Circuit explained that such a phrase is ambiguous because it is unclear whether the claimant must submit to the administrator satisfactory proof which would imply an objective standard of "satisfactory proof," or the claimant must submit proof that is satisfactory to the administrator which would imply a subjective standard of "satisfactory proof." *Id.* It is the administrator's burden to prove that discretionary authority has been granted. *Id.* at 249.

In this case, the plan clearly reserves discretion for the plan administrator. The plan provides that "YHP may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of the policies and coverage plans described in this handbook." [Dkt. #14, Def.'s Mem., Ex. A, p. 76]. Whether a visit may be characterized as an emergency or not is also explicitly within YHP's discretion as the plan provides that, "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied." [*Id.* at 63.]. The language of the plan

plainly permits YHP to adopt reasonable interpretations and use their judgment in determining the outcome of particular claims.  Accordingly the plan unambiguously grants discretionary authority to the plan administrator to determine eligibility.  *See Nichols*, 406 F.3d at 108 ("in our judgment" is a phrase clearly granting discretionary authority).

Once it is clear that the administrator has discretionary authority, then the standard of review shifts from *de novo* to an arbitrary and capricious standard of review.  *Id.*; *see also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 131 (2d Cir. 2008); *Krauss*, 517 F.3d at 622; *Pastore v. Witco Corp. Severance Plan*, 196 Fed. Appx. 18, 21 (2d. Cir. 2006); *Brockett v. Reed*, 78 Fed. Appx. 148, 150 (2d Cir. 2003); *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  A decision that is arbitrary and capricious will not be upheld and is defined as "without reason, not supported by substantial evidence or erroneous as a matter of law."  *Kinstler*, 181 F.3d at 249(citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'"  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  "This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker."  *Burgio v. Prudential Ins. Co. of America*, Np.06-CV-6793, 2011 WL 4532482, at *4 (E.D.N.Y.  Sept. 26, 2011) (citing *Pagan v. NYNEX*

*Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) and *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).

In addition, courts have held that where a plan administrator both evaluates and pays benefits claims out of its own pocket, the administrator has a conflict of interest that must be taken into account in a court's review under an arbitrary and capricious standard.  The conflict of interest analysis was articulated by the Supreme Court in *Glenn.  Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2349 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court … Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.   We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.") (citations omitted).

A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of "several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials."  *McCauley*, 551 at 133.  The Court must "determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, 'perhaps to the vanishing point.'"  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund,*

609 F.3d 133, 138 (2d Cir.2010) (citation omitted).  The Second Circuit has further

instructed that:

> The weight properly accorded a *Glenn* conflict varies in direct proportion to
> the likelihood that [the conflict] affected the benefits decision.  'The conflict
> ... should prove more important (perhaps of great importance) where
> circumstances suggest a higher likelihood that it affected the benefits
> decision, including, but not limited to, cases where an insurance company
> administrator has a history of biased claims administration. It should prove
> less important (perhaps to the vanishing point) where the administrator has
> taken active steps to reduce potential bias and to promote accuracy, for
> example, by walling off claims administrators from those interested in firm
> finances, or by imposing management checks that penalize inaccurate
> decisionmaking irrespective of whom the inaccuracy benefits.'

*Durakovic*, 609 F.3d at 139-140 (quoting *Glenn*, 128 S.Ct. at 2351).

<u>Analysis</u>

*i.    Plaintiff's breach of contract claims are pre-empted by ERISA*

Although Plaintiff alleges in her complaint that her cause of action arises

under ERISA, she also discusses her view that YHP has engaged in a breach of

contract throughout her complaint.  For example, Plaintiff alleges that the

"second violation of procedure and breach of contract begins with Plaintiff's

follow-up visit with Dr. D'Amico on August 5, 2008."  *See* [Dkt. #1, Compl. at p.3-

4].  Since Plaintiff is proceeding *pro se*, the Court must liberally construe her

complaint and submissions.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d

471, 475 (2d Cir. 2006) ("This policy of liberally construing *pro se* submissions is

driven by the understanding that implicit in the right of self-representation is an

obligation on the part of the court to make reasonable allowances to protect *pro*

*se* litigants from inadvertent forfeiture of important rights because of their lack of

legal training") (internal quotation marks and citation omitted).  Accordingly, the

Court construes Plaintiff's complaint to also contain a state law breach a contract claim.

It is well established that all state law claims, such as breach of contract, that relate to a plan regulated by ERISA are preempted. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-56 (1987) (examining structure and language of the statute as well as legislative history to conclude that ERISA preempts state claims); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 200-01 (2004) ("Any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted"); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 112 (2d Cir. 2008) (finding breach of contract, among a variety of other claims to be preempted by ERISA); *Devlin v. Transp. Commc'n Int'l Union*, 173 F.3d 94, 101 (2d Cir. 1999) (finding union contract claims preempted); *Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir. 1998) (preempting breach of contract claims arising out of failure to pay medical benefits); *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.3d 588, 591 (2d Cir. 1993); *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 10 (2d Cir. 1992) (preempting breach of pension contract claims).  Since Plaintiff's breach of contract claims directly relate to a plan covered by ERISA, such claims are pre-empted by ERISA.

> ii.   *The Court need not address Plaintiff's claim that YHP violated the timing requirements under 29 C.F.R. 2560.503-1*

The Plaintiff claims that YHP violated the timing requirements under 29 C.F.R. 2560.503-1.  Plaintiff devotes a significant portion of her brief in opposition

to Defendant's motion for judgment on the administrative record arguing that YHP did not return her repeated phone calls within 72 hours as is required in connection with urgent care claims under 29 C.F.R. §2560.530-1(f)(2)(i) or within 15 days as is required in connection with pre-service claims under 29 C.F.R. §2560.530-1(f)(iii).

29 C.F.R. 2560.503-1 expressly provides that the remedy for a "failure of a plan to establish or follow claims procedures consistent with the requirements of this section" is that "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. §2560.530-1(l).  Under section 502(a) of the Act, a participant or beneficiary is entitled to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" or for the relief provided in section 502(c). *See* 29 U.S.C. §1132.

Section 502(c) provides that a court, in its discretion, may assess civil penalties of up to $110 a day against plan administrators in connection with an administrator's refusal to supply requested information as required under certain subsections of ERISA.  *See Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 140 (2d Cir. 1997) (the "court has discretion to order administrator to pay penalty of $100 per day for each day, in excess of 30, of failure to make a disclosure required by ERISA") (citing 502(c), 29 U.S.C.

§1132(c)(1)).  Section 502(c) does not refer to any regulations promulgated under ERISA.  Instead Section 502(c) appears to only provide penalties in connection with a violation of a certain subsection of ERISA and does not extend to regulations promulgated under ERISA.

Although the Second Circuit has not addressed this issue, several other circuits have held that the civil penalties provided under Section 502(c) apply only to violations of a duty imposed by the statute and not a duty imposed by regulations promulgated thereunder.  *See e.g., Wilcynski v. Lumbermens Mutual Casaulty Co.*, 93 F.3d 397 (7th Cir. 1996) (holding that Section 502(c) penalties can be assessed only for conduct that breaches an administrator's duty of disclosure created by ERISA subchapter I and that "violations of regulations promulgated thereunder will not suffice.");  *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 147 (3d Cir. 2007) (noting that the Third Circuit has previously "held that the defendants' failure to provide information required by federal regulations did not state a claim under ERISA § 502(c)(1)" and that "502(c) subjects plan administrators to liability only for failure or refusal to release the information that Subchapter 1 of ERISA" requires) (citing *Groves v. Modified Ret. Plan*, 803 F.2d 109, 111 (3d Cir. 1986)); *see also Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996) (holding that civil penalties are available for administrator "who fail to furnish requested documents that are required to be furnished by § 104(b)(4)").

Moreover, several district courts in the Second Circuit have held that Section 502(c) penalties do not apply to violations of agency regulations and in particular have found that Section 502(c) penalties are not available for purported

violations of 29 C.F.R. §2560.530-1.  *See e.g., Anderson v. Sotheby's Inc. Severance Plan*, No.04Civ.8180, 2005 WL 1309056, at *4 (S.D.N.Y. May 31, 2005) (concluding that plaintiff was not entitled to sanctions for plan's alleged failure to produce requested documents under 29 C.F.R. §§2650.503-1 since "a violation of ERISA's implementing regulations cannot support the imposition of sanctions under section 1132 [Section 502(c)]"); *Mohamed v. Sanofi-Aventis Pharmacueticals*, No.06CIV.1504, 2009 WL 4975260, at *21 (S.D.N.Y. Dec. 22, 2009) (holding that plaintiff could not recover for plan's alleged violations of 29 C.F.R. §2560.530-1(h)(2)(iii), (m)(8) under Section 502(c)(1), 29 U.S.C. § 1132(c)(1)); *Gill v. Bausch & Lomb Supplemental Retirement Income Plan*, No.09-CV-6043, 2009 WL 3164854, at *4-5 (W.D.N.Y. Sept. 28, 2009) (holding that Plaintiffs could not seek to impose Section 502(c) penalties for violation of a regulation under 29 C.F.R. §§2650.503-1).  Therefore the Plaintiff would not be entitled to the imposition of any civil penalties under Section 502(c) for YHP's alleged violations of 29 C.F.R. §2560.530-1.

Accordingly, Plaintiff's only remedy for YHP's purported violations of 29 C.F.R. §2560.530-1 would be the ability to bring a civil action without having to exhaust her administrative remedies to recover benefits due to her under the terms of her plan or to enforce her rights under the terms of the plan.  In effect, the Plaintiff has already received this remedy as she has brought the pending action to challenge YHP's denial of her claims for the out-of-network services provided by Dr. D'Amico.  The issue of whether YHP violated or did not violate the timing requirements under 29 C.F.R. 2560.503-1 is therefore moot since Plaintiff

24

has a pending civil action challenging the underlying benefits determination.  The Court would have no basis to grant Plaintiff any other relief or recovery upon the Court finding that YHP violated 29 C.F.R. 2560.503-1. A violation of 29 C.F.R. 2560.503-1 does not entitle the Plaintiff to recover the relief she requests which is the reimbursement of her medical bills in the amount of $47,513.

Consequently, Plaintiff has in effect already received the remedy to which she would be entitled upon a finding that YHP had violated the regulation. Moreover, Plaintiff would not be entitled to any other recovery based on a finding that YHP violated 29 C.F.R. 2560.503-1.  For these reasons, the Court need not address whether YHP violated the timing requirements of 29 C.F.R. 2560.503-1.

> iii.    *YHP's decision to deny Plaintiff's claims for the out-of-network services provided by Dr. D'Amico was not arbitrary and capricious.*

Although Plaintiff's opposition to Defendant's motion for judgment on the administrative record and her complaint are mainly focused on demonstrating that YHP violated the timing requirements under 29 C.F.R. 2560.503-1, Plaintiff appears to also argue that YHP's denial of coverage was arbitrary and capricious because YPH failed to give its reasons for the approval or denial of her claims. *See* [Dkt.# 1, Compl.].

The parties agree that all services received between May 31, 2008 and June 16, 2008 at both the Yale New Haven Hospital and New England Retina Associates were covered by the Plan.  [*See* Dkt. #14, Def.'s Mem., p. 3 and Dkt. #20 Pl.'s Mem., p. 6-7].  Furthermore, since YHP agreed on appeal to reimburse Plaintiff for her claims for the June 17 and June 18, 2008 visits to Dr. D'Amico these claims are not at issue.  [Dkt. #14, Def.'s Mem., Ex. L].  In addition, it is unclear from the

record whether Plaintiff has exhausted her administrative remedies in connection with her claims for the services provided on June 20, June 26, August 5, September 10 and September 17, 2008 as there is no indication that Plaintiff internally appealed the denial of her claims for those visits.

Since Plaintiff has failed to demonstrate that she has exhausted her administrative remedies in connection with her claims for the June 20, June 26, August 5, September 10 and September 17, 2008 visits the Court does not have jurisdiction to entertain those claims.  "Courts within the Second Circuit have long recognized 'the firmly established federal policy' requiring plaintiffs seeking relief under section 502(a)(1)(B) to demonstrate that they have fully pursued the claims procedures prescribed by the relevant employee benefit plan prior to bringing suit."  *Kirkendall v. Halliburton, Inc.*, No.07-CV-289-JTC, 2011 WL 2360058, at *4 (W.D.N.Y. June 9, 20110) (quoting *Bernie Wolff Const. Corp.*, 788 F.2d 76. 79 (2d Cir. 1986)).  "Adherence to the exhaustion requirement helps to reduce the number of frivolous lawsuits under ERISA, promotes the consistent treatment of claims for benefits, provides a non-adversarial method of claims settlement, and minimizes the costs of claims settlement.  Consistent with these purposes, the federal courts regularly dismiss claims for judicial determination of benefits under an ERISA-regulated plan where the plaintiff has failed to plead and prove exhaustion of the plan's administrative remedies."  *Id.* (internal quotation marks and citations omitted).  Accordingly, since Plaintiff has failed to plead and prove exhaustion of the plan's administrative remedies for the services provided by Dr. D'Amico on June 20, June 26, August 5, September 10 and September 17,

2008, the Court will only consider whether YHP's denial of coverage for the August 13, 2008 surgery was arbitrary and capricious.

Under the clear and express terms of the plan, Plaintiff would only be entitled to reimbursement for the services provided by an out-of-network physician under two exceptions.  First, where the care is for an emergency or urgent condition and second, where the care has been arranged in advance by a YHP clinician and approved by YHP's Care Coordination Department.  *See* [Dkt. #14, Def.'s Mem., Ex. A].  Contrary to Halo's contention, YHP did provide its reasons for denying her coverage and informed Halo that it had denied coverage because the services provided by Dr. D'Amico had not been pre-approved and were not care for an emergency or urgent condition.  YHP issued explanation of benefits for each date of service explaining that the claim for payment was denied because the services were not pre-approved as required for out-of-network care which was neither emergent nor urgent.  YHP also specifically explained to Halo in its August 15, 2008 letter that it "[y]ou elected to leave the New Haven area and requested coverage for a second opinion with a physician, Dr. D'Amico, in New York.  Coverage for non-emergency out of network care is not part of your health care benefit with Yale Health Plan, but we routinely do allow coverage *for consultation only* with an out-of-network clinician for the purposes of obtaining a second opinion.  Your request for such a consultation was approved.  The services provided by Dr. D'Amico went beyond consultation, resulting in charges that were not covered by the original request."  [Dkt. #14, Def.'s Mem., Ex. J] [emphasis in the original].  In addition, YHP also explained that it had "concluded

that the communication informing you that coverage for further visits and follow-up surgery with Dr. D'Amico would be denied, based on the terms of your coverage, was clear and explicit."  [*Id.*].

YHP has therefore complied with the notice requirements under 29 C.F.R. §§2560.530-1(g),(h),(j) to provide the specific reason or reasons for the adverse determination.  The "fundamental purpose of these procedural requirements is to insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case."  *Alternative Case Sys. v. Metropolitan Life Ins. Co.*, No.92Civ.7208(RPP), 1996 WL 67737, at *2-3 (S.D.N.Y. Feb. 16, 1996); *see also Schnur v. CTC Communications Corp. Group Disability Plan*, 413 Fed. Appx. 377, 380 (2d Cir. 2011) (finding that plan's notice complied 29 C.F.R. §2560.530-1(g) because the "notice of denial—a thorough, four-and-a-half-page document—amply laid out the basis for the denial, and, by implication, a description of those materials necessary to perfect the claim.   Specifically, that notice informed [plaintiff] that 'we do not see any evidence in the current medical records to establish that your condition imposes a physical or psychological impairment that would preclude you from engaging in the substantial and material duties of your regular occupation on a sustained basis.'"); *Cook v. New York Times Co. Long-Term Disability Plan*, No.02Civ.9154(GEL), 2004 WL 203111, at *11 (S.D.N.Y. Jan. 30, 2004) ("The denial of plaintiff's first appeal was based on deficiencies in plaintiff's submissions that had never been communicated to her in MetLife's initial letter, and that she had never been given the opportunity to cure.  A denial of an appeal

that is based on insufficient notice as to how the claim might be perfected fails to meet the requirements of ERISA and its implementing regulations, and is therefore unreasonable as a matter of law.").

Here, YHP has amply indicated that the basis for its denial of coverage was that the services were not pre-approved or for emergency or urgent care.   The Student Handbook amply describes the coverage afforded by the plan, the exclusions of coverage for out-of-network healthcare of a non-emergency and non-exigent nature absent pre-approval.  [Dkt. #14, Ex. A at p. 12, 40, 42, 44,59, 61-63, 69 and 86].  YHP has therefore also by implication given Plaintiff a description of how she could perfect or cure her claim and thereby enabled her to have a fair chance to present her case on appeal.  It is undisputed that YHP had not pre-approved the August 13, 2008 surgery.  Accordingly, YHP's August 15, 2008 letter put Plaintiff on notice that she could potentially cure her claim by presenting evidence that the services provided were for emergency or urgent care.  Since YHP provided a sufficient explanation of its reasons for denying coverage, Plaintiff was able to address the determinative issues on appeal and had a fair chance to present her case.  Accordingly, YHP's denial of coverage was not arbitrary and capricious.

The Court also notes that the Plaintiff failed to address those determinative issues on appeal and therefore failed to carry her burden to establish that she was entitled to the benefit pursuant to the terms of the plan.  *See Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 287-88 (2d Cir. 2000) (Plaintiffs "were required to prove their case; to establish that they were entitled

to that benefit pursuant to the terms of the Contract or applicable federal law); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658-59 (8th Cir. 1992) (burden of proof is on ERISA plaintiff to establish medically necessity where it is prerequisite for entitlement to benefit). On appeal, Plaintiff simply submitted her own letters which were replete with her lay medical conclusions and contained no factual content to support a conclusion that the services were for emergency or urgent care. In Plaintiff's September 8, 2008 appeal letter, she states that in her opinion the August 13 surgery was "medically necessary: the surgery entailed removal of the lens because of a cataract that had rapidly developed from the perfluoropropane gas, removal of that gas, which still occupied between 33-50% of the volume of her eye after 8 weeks of recovery performed by Dr. Liggett, laser therapy to reattach the retina, and installation of a silicone oil bubble to stabilize recovery." Dkt. #14, Def.'s Mem., Ex. K].

Plaintiff did not provide YHP with any quantifiable medical documentation establishing that the services were care for an emergency or urgent condition. For example, Plaintiff did not submit a letter or other documentation from Dr. D'Amico expressing his medical opinion that the care provided was for an emergency or urgent condition. In fact, the Court has reviewed all of the medical records that Plaintiff has submitted into the record and there is no mention or indication in any of these records that Dr. D'Amico provided Halo with care for an emergency or urgent condition. The medical records describe the majority of the services provided by Dr. D'Amico as "follow up visit" and expressly note that Halo had transferred her care to Dr. D'Amico because she is moving to her

parents place in NJ.  *See* [Dkt. #20, Ex. B].  There is simply no evidence in Plaintiff's medical records that she was being provided with care by Dr. D'Amico for an emergency or urgent condition.   In fact, the medical records indicate that Halo had transferred her entire care to Dr. D'Amico and thereby had elected to stop seeking treatment with an in-network physician.

On appeal, Plaintiff failed to present any factual basis beyond her own lay opinion that would support the conclusion that YHP's determination that the care provided by Dr. D'Amico was not for an emergency or urgent condition was arbitrary and capricious.  Accordingly, YHP's continued denial of coverage based on its conclusion that the services were not pre-authorized or for emergency or urgent care is supported by substantial evidence.  A reasonable mind would accept the evidence in the record as adequate to support the conclusion reached by YHP that the services provided by Dr. D'Amico were not care for an emergency or urgent condition and were not pre-authorized.

Lastly, it is unclear from the record whether YHP both evaluates and pays benefits claims out of its own pocket.  Assuming that it does, there is no evidence that YHP's denial of coverage was in any way influenced by a conflict of interest.

<u>Conclusion</u>

Based upon the above reasoning, the Court GRANTS Defendant's [Dkt. #14] motion for judgment on the administrative record.   The Clerk is directed to enter judgment in favor of Defendant and close the file.

**IT IS SO ORDERED.**

**_____/s/_____**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 8, 2012**