**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TIFFANY L. HALO, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO.: |
| | : | 3:10-cv-1949 (VLB) |
| | : | |
| v. | : | |
| | : | |
| YALE HEALTH PLAN, | : | |
| DEFENDANT. | : | September 30, 2014 |

<u>MEMORANDUM OF DECISION GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [DKT. #38] AND REMANDING FOR FURTHER PROCEEDINGS</u>

The Plaintiff, Tiffany L. Halo ("Halo"), who at all times relevant to this proceeding was a student at Yale University and an insured under Yale Health Plan ("YHP"), brings this action *pro se* against the Defendant, YHP, under the Employee Retirement Income Security Act of 1974 ("ERISA").  Plaintiff alleges that Defendant violated the provisions of 29 C.F.R. § 2560.503-1, which governs the timing of notification of benefit determinations, and that YHP acted in an arbitrary and capricious manner in denying her coverage for out-of-network urgent or emergency care.[1]  On August 19, 2011, YHP moved for judgment on the administrative record.  *See* [Dkt. #14].  Halo submitted a twenty-eight page objection to YHP's motion, citing Federal Rule of Civil Procedure 56 and applicable case law, *see* [Dkt. #20, Pl.'s Resp. in Opp'n, at 1-2, 17-19], but did not

---

[1]  Her single count complaint can also be construed to allege a second claim for breach of contract under ERISA.  For the reasons stated in this Court's Order, dated March 8, 2012 [Dkt. #27, Order, at 20-21], this claim is pre-empted by ERISA.

1

file affidavits or other admissible evidence supporting her benefit claim.  This Court treated YHP's motion as one for summary judgment and, relying on the administrative record upon which YHP based its decision, granted judgment on the administrative record in YHP's favor, on March 9, 2012.  [Dkt. #28].

On April 9, 2012, Halo appealed this Court's judgment.  [Dkt. #29].  On October 11, 2013, the Second Circuit vacated and remanded the judgment.  [Dkt. #34].  In its Summary Order, the Second Circuit held that Halo did not receive proper notice of the consequences of failing to respond to a motion for summary judgment.  *See* [Dkt. #34, Mandate of USCA, at 5].  Further, in response to the *amicus curiae* brief filed by the Department of Labor in support of Halo's appeal, in addition to the merits of Halo's claims, the Second Circuit directed this Court to consider whether YHP violated the procedural requirements for claim administration under 29 C.F.R. § 2560.503-1, and if so, whether Halo is entitled to civil penalties and to *de novo* review of her claims.  [*Id.* at 6-7].

On December 27, 2013, YHP renewed its motion for judgment on the administrative record to affirm YHP's coverage decisions.  [Dkt. #38].  On February 24, 2014, Halo filed her Opposition to YHP's motion. [Dkt. #43].  On March 21, 2014, YHP filed its Reply to Halo's Opposition.  [Dkt. #46].  On April 24 and September 2, 2014, Halo filed supplemental evidence and briefing. [Dkt. ##20, 52 and 53].  After consideration of the record and the mandate of the Second Circuit, for the reasons stated hereinafter, the Defendant's motion for judgment on the administrative record is granted, in part, and denied in part.

**Background Facts**

a.  **Plaintiff's Health Coverage**

 As an enrolled student attending Yale at least half time and working towards a Yale degree, Halo was a member of the Yale Health Plan and received "YHP Basic" coverage at no charge.  [Dkt. #38-3, Ex. A (Yale Health Plan Student Handbook) at 11].  YHP Basic coverage included: Primary care through Yale's Student Medicine or Internal Medicine Departments, gynecology services, preventative medicine services, such as routine eye exams, flu shots, and skin cancer screening, laboratory services, access to 24-hour urgent care through the Urgent Care Department, mental health services, nutritional counseling, and some use of Yale's Inpatient Care Facility.  [*Id.*].

In addition to the YHP Basic plan, Halo purchased YHP Hospitalization/Specialty Coverage (the "Specialty Plan").  [Dkt. #43, Opp. at 12]. The Specialty Plan offers three types of coverage "at 100%": (i) outpatient specialty care received through the YHP health care network, (ii) approved inpatient care at YHP-approved inpatient facilities, and (iii) limited out-of-network care.  [Dkt. #38-3, Ex. A at 58].

Under the Specialty Plan, "[e]mergency care and pre-authorized follow-up care for emergency conditions is covered at 100% regardless of location."  [*Id.* at 62].  YHP defines an "emergency condition" as "a major acute medical problem or major acute trauma that requires immediate medical attention or a condition that could lead to serious harm or death if care is no received or is delayed."  [*Id.*]. Emergency coverage includes "emergency facility fees, laboratory expenses,

radiological expenses, emergency physicians' fees, ambulance transportation, and pre-authorized short-term follow-up care."  [*Id.*].

In the event of an emergency condition, YHP instructs covered beneficiaries to "contact the YHP Care Coordination Department within 48 hours (or 2 business days) of receiving emergency outpatient treatment or being admitted to an emergency facility."  [*Id.*].  After receiving notification of emergency care, the Care Coordination Department "will (1) notify YHP clinical staff of [the beneficiary's] condition so that they can coordinate [the beneficiary's] care as appropriate . . . and (2) pre-authorize any necessary follow-up care."  [*Id.*]. The Specialty Plan expressly warns that any "[f]ollow-up care that is not pre-authorized may be denied."  [*Id.*].

The Specialty Plan also provides 100% coverage for "[u]rgent care at any medical facility" when a beneficiary is "away from New Haven County."  [*Id.* at 63]. YHP defines an "urgent condition" as "the sudden and unexpected onset of an acute medical problem or trauma that requires immediate medical attention." [*Id.*].  "Urgent conditions" do not include "chronic conditions, maintenance care, and routine care."  [*Id.*].  As is the case with emergency care, beneficiaries are instructed to "contact the YHP Care Coordination Department within 48 hours (or 2 business days) of any care received out of area for an urgent condition to ensure that YHP clinical staff are aware of your condition and to request the Care Coordination Department to pre-authorize follow-up care."  [*Id.*].  YHP also warns that "[f]ollow-up care that is not pre-authorized may be denied."  [*Id.*].

Finally, YHP informs its beneficiaries that, "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied.  This includes all elective admissions or treatments.  Coverage will also be denied for conditions that could have been treated at YUHS but were not while the student or enrolled dependent was in area."  [*Id.*].

     **b. Claims and Appeals Process**

YHP's Student Handbook describes the procedures governing the submission of claims for coverage:

> Claims for reimbursement of covered services should be accompanied by itemized bills for services rendered (charge card receipts and balance due statements are not acceptable).  Bills for services must include diagnosis and procedure codes for determination of coverage.  Claim forms are available in the Claims Department.  Please submit claims to:
>
>         **Yale Health Plan**
>         **Claims Department**
>         **55 Whitney Avenue (2nd floor)**
>         **P.O. Box 208217**
>         **New Haven, CT 06520-8217**

[*Id.* at 39].

YHP also advises that "[c]laims for covered services are honored for one year from the date of service."  [*Id.*].  In the event a claim is denied, beneficiaries "have a right to appeal the decision."  [*Id.* at 41].  YHP provides for a two-level appeals process.  The first level "requires a request for reconsideration in writing within 180 days from the date of receipt of the initial determination."  [*Id.*].  Once a beneficiary has received written notice that their first appeal was unsuccessful, they may request a second level appeal.  "Second level appeals must be requested in writing within 60 days of receipt of the first level claim appeal

determination and mailed to the Yale Health Plan Patient Representative."  [*Id.*].
This second review "will be completed within 30 days of receipt of the [second]
appeal."  [*Id.*].

    **c.  Plaintiff's In-Network Treatment**

    The series of incidents involving Plaintiff's eye condition began on May 31,
2008, when Halo developed a visual disturbance in her left eye.  She went to the
Yale University Health Services Urgent Care Department and was referred to Yale
New Haven Hospital for an inpatient consultation.  [Dkt. #38-4, Ex. B, at 1-2].  She
was examined by Dr. Joan Cho, who identified a "[f]ocal visual field abnormality"
and recommended that the Plaintiff "be evaluated by opthamology today."  [*Id.* at
2].  Later that day, Halo went to Yale-New Haven hospital, an in-network care
provider, for an eye consultation.  [Dkt. #43, Opp. at 9].  Halo was examined by Dr.
Huffman.  During his examination of Plaintiff's retina, Dr. Huffman detected
"retinal folds" and a possible "small hole."   [Dkt. #38-4, Ex. B, at 3].

    At Dr. Huffman's direction, Halo returned to the hospital the following
morning, June 1, 2008, for a new patient evaluation.   [Dkt. #43, Opp. at 9].  There,
Dr. Kempton examined Plaintiff's eyes and determined that Halo had a "[r]etinal
hole."  [Dkt. #38-4, Ex. B, at 6].  Accordingly, Dr. Kempton recommended that Halo
undergo a scleral buckle/cryotherapy procedure that day, June 1, with Dr. Liggett.
[*Id.*]  Dr. Kempton also concluded that Halo "will need laser [r]etinopexy[2] . . . this
week."  [*Id.*]  Plaintiff alleges in her Opposition that Dr. Kempton stated that "a
retinal break is an eye emergency requiring immediate medical attention to

---

[2]  Laser retinopexy is a procedure to treat retinal tears and detachments.

prevent vision loss." [Dkt. #43, Opp. at 9-10]. The medical records prepared at the time of Halo's visit on June 1, 2008 do not describe her condition as "an eye emergency," nor do they state that her condition "requir[es] immediate medical attention to prevent vision loss." [Dkt. #38-4, Ex. B, at 4-6].

On June 1, 2008, Dr. Kempton performed surgery on Halo's left eye. [Dkt. #38-4, Ex. B, at 7-9]. The surgery was supervised by Dr. Peter Liggett, a specialist in retinal detachment. [Dkt. #43, Opp. at 10]. Follow up appointments were scheduled for June 2 and 9, 2008 with Dr. Huang at Yale New Haven Hospital. [*Id.*]. During the latter of these two appointments, Dr. Huang determined that the surgery had not repaired the retina. [*Id.*]. Halo further alleges that at this June 9 appointment, Dr. Huang stated that "a retinal break is an eye emergency." [*Id.*; Dkt. #43-8, Ex. W (Aff. of Candace Halo) at ¶ 4]. Halo has not submitted a contemporaneous treatment note or other statement from Dr. Huang indicating that her treatment was of an emergency nature.

On June 11, 2008, Halo was referred to Dr. Liggett for a second opinion with New England Retina Associates ("NHRA"), an in-network care provider. [Dkt. #43, Opp. at 10]. The report documenting Plaintiff's examination that day states that "[t]he adhesion (cryo) used doesn't work as well on thin retinas (takes about a week to seal well)." [Dkt. #38-4, Ex. B, at 14]. The report further notes that, "[a]t some point, [Halo] should have laser [surgery] to secure lattice areas" and that Plaintiff's "OS[3] is detached[.] [Surgery] on Friday [June 13, 2008]." [*Id.*] Finally, the report states that the doctor "discussed" "head positioning" with Halo, and

---

[3] "OS" is a common abbreviation for the "oculus sinister," or the left eye.

that a "[c]ataract will develop . . . [and] will require extraction within [two years]."
[*Id.*]  Plaintiff alleges that during his examination, Dr. Liggett stated that, "unless
[Halo] had immediate surgery the retina would continue to peel off the back wall
of her eye and that she would have permanent loss of vision."  [Dkt. #43, Opp. at
10; Dkt. #43-8, Ex. W at ¶ 5].  Although Plaintiff's examination report does state
that "[a]t some point she should have laser surgery to secure lattice areas,
[noting that] OS is <u>detached</u> [and instructs her to] Return: Friday," it does not
make any reference to "permanent loss of vision" or state that she needs
"immediate surgery."  [Dkt. #38-4, Ex. B, at 13-14].

Two days later, on Friday, June 13, 2008, in accordance with his
recommendation, Dr. Liggett performed a vitrectomy[4] on Halo.  [Dkt. #43, Opp. at
10].  She returned the next day, June 14, 2008, for a follow-up visit.  The report of
this visit states that Halo "slept well," that she exhibited "[m]ild [s]welling" in her
eyes, and that she was experiencing "pain" in her left eye, but that the pain was
"resolved as of today."  [Dkt. #38-4, Ex. B, at 15].  Plaintiff was also given a cell
phone number to call over the weekend if there were any further complications,
and was instructed to return in two days.  [*Id.* at 16; Dkt. #43, Opp. at 10-11].

On the morning of Monday, June 16, 2008, the day Halo was scheduled to
return to NHRA for a consultation, Halo and her mother allege that they made
several calls to NHRA and to the cell phone number Halo had been given.  *See*

---

[4]  A vitrectomy is a surgical procedure to repair a detached retina, during which
the vitreous gel is removed from the eye and silicone gas is injected into the
eye to replace the gel and restore normal pressure to the eye.  *See* [Dkt. #43,
Opp. at 10 n.2].

[Dkt. #43, Opp. at 11; Dkt. #43-6, Ex. S (Verizon Telephone Records) at A-210; Dkt. #43-7, Ex. S at A-220].  Later that day, Halo went in to NHRA for her scheduled appointment, and was examined by Dr. Haffner.  Dr. Haffner's report states that Halo had been suffering "severe pain [in her left eye] since 7:30 this [morning]."  [Dkt. #38-4, Ex. B, at 17].  The report notes that the pain had "gotten worse thr[oughout] the day," but that Halo "was ok[ay] this weekend."  [*Id.*]  Dr. Haffner concluded that an increase in intra-ocular pressure in Halo's left eye was the cause of her severe pain.  [*Id.* at 17-19; Dkt. #43, Opp. at 11].  Dr. Haffner performed a procedure to release this pressure and instructed Halo to return in two days.  [Dkt. #38-4, Ex. B, at 18].

### d.   Plaintiff Receives Approval for Second Opinion with Out-of-Network Physician and Undergoes Procedures

On June 16, 2008, the same day Halo was examined by Dr. Haffner, Halo's mother made a request by telephone to YHP for a second opinion on Halo's condition.  *See* [Dkt. #38, Mot. for J., at 8; Dkt. #43, Opp. at 13].  Plaintiff's mother spoke with Vicki Eisler, of Yale Member Services.  The parties agree that during this call, Halo's mother stated that Halo wanted to see Dr. D'Amico, a world-renowned eye specialist, that she felt Halo's "post-op care" was "awful," and that Halo did not "feel comfortable going back to Dr. Liggett."  [Dkt. #38-4, Ex. B at 19; Dkt. #43, Opp. at 13].  Plaintiff also alleges that during this call, her mother informed Ms. Eisler of Halo's "urgent care [sic] and the fact that [Halo] was still in severe pain."  [Dkt. #43-8, Ex. W at ¶ 7].

Within 24 hours, Dr. Forster, Chief of Ophthalmology at Yale University Health Services, called and approved the referral for a second opinion with Dr.

D'Amico of Weill Cornell Ophthalmology Associates ("Weill"), an out-of-network doctor.  [Dkt. #38, Mot. for J., at 8; Dkt. #43, Opp. at 13].[5]  That same day, on June 17, 2008, YHP sent Halo a letter reiterating its verbal authorization of an out-of-network second opinion and reminding her that any additional services beyond her visit for a second opinion must be further approved before they would be covered under the plan. [Dkt. #38, Def.'s Mot. for J. at 8; Dkt. #38-5, Ex. C].

On June 17, 2008, Dr. D'Amico saw Halo and determined that immediate treatment was necessary.  Halo received treatment the same day.  Halo further alleges that, while she was at Weill, her father contacted YHP and informed them of her "emergency treatment."  [Dkt. #43, Opp. at 14].  The Weill treatment record of Halo's June 17, 2008 visit states, "Patient will move to her parents in N.J. and would like to transfer her care to W[eill]."  [Dkt. # 38-4, Ex. B, at 22].

Without seeking or obtaining prior authorization from YHP, Halo went to see Dr. D'Amico the next day for a follow-up.  [Dkt. #38, Mot. for J., at 9; Dkt. #43, Opp. at 14].  Halo alleges that, either on June 17 or June 18, her father received a telephone call from Vicki Eisler, of YHP, who told him that Halo's "circumstances were emergency in nature" and that authorization to extend the referral to include medical benefits was granted for Halo's care with Dr. D'Amico through June 30, 2008.[6]  The Weill treatment record of this visit noted that Halo was "feeling much

---

[5]  Citing to her mother's affidavit and telephone records, Halo also contends that, during this conversation, Dr. Forster told Halo to "contact Ms. Vicki Eisler in [the] YUHS Claims Department for any further 'emergency treatment.'"  [Dkt. #43, Opp. at 13].

[6]  Halo has submitted conflicting evidence in the record as to when this call occurred.  In her February 2014 Opposition, Halo asserts that the call occurred

better today after anterior paracentesis yesterday," that Halo was "much improved," and that Dr. D'Amico "[w]ill cont[inue] to monitor" Halo.  [Dkt. #38-4, Ex. B, at 25-26].  The Weill record does not state that Halo received emergency or urgent treatment of an acute medical condition.  *Id.*

   e.   Plaintiff Seeks and Ultimately Receives Coverage For Her June 17 and June 18, 2008 Procedures

   The bills for the visits on June 17 and June 18, 2008 were received by YHP's Claims Department on July 8, 2008.  [Dkt. #38-6, Ex. D.]  The bills were itemized and included procedure codes, diagnosis pointers, and the Claims Department address.  [*Id.*]  In a form entitled "Explanation of Benefits," dated July 30, 2008, YHP denied all but one of Halo's claims.  [Dkt. #38-7 at Ex. E].  The form stated that the denials were because the "service[s] [were] not authorized."  [*Id.*]  Halo alleges that she received this form on August 6, 2008.  *See* [Dkt #1, Compl. at 4; Dkt. #38-8, Ex. F at 2].

   The next day, August 7, 2008, Halo sent a letter to Connie Rollinson, YHP's Manager of Claims, which Halo explained was "to serve as a formal 'first level claim appeal.'"  [Dkt. #38-8 at Ex. F].  In her letter, Halo described the events beginning on May 31, 2008, when she "went to the Yale University health Services Emergency Room," through August 6, 2008, when she spoke with YHP's Vicki

---

on June 18, 2008.  [Dkt. #43, Opp. at 14].  The accompanying affidavit from Halo's father also states that this call occurred on that day.  [Dkt. #43-8, Ex. V at ¶ 3].  However, in the record before YHP at the time it denied her claims was Halo's August 7, 2008 letter, which described the call using nearly the exact same language, but stated that it occurred the day before, on June 17, 2008.  *See* [Dkt. #38-8, Ex. F at 2].  YHP sent the written referral, which stated only an approval for a second opinion, to Halo on June 17.  [Dkt. #38-5 at Ex. C].

Eisler after receiving the denial form.  [*Id.* at 1-2].  Halo informed Ms. Rollinson that on the same day she met with Dr. D'Amico for the first time, June 17, 2008, she and her mother "consulted Dr. Susan Forster, the physician handling [Halo]'s case at Yale Health Services, about the 'emergency situation.'"  [*Id.* at 2].  She further explained that, during this conversation, "Dr. Forster approve[d] the referral for a second opinion and inform[ed] Tiffany that she must consult with Ms. Vicki Eisler . . . for any further, 'emergency coverage.'"  [*Id.*].

Halo's August 7, 2008 letter next recounted her conversation with Ms. Eisler that day (June 17), who allegedly told Halo that her "circumstances were, 'emergency in nature' and that authorization for extended referral and coverage of benefits would be given for [Halo]'s care with Dr. D'Amico until [June 30, 2008]."  [*Id.*].  There is no evidence in the record before the administrator which would form the basis of a conclusion that Halo's circumstances were emergency in nature.  There is nothing in the claim file on June 17, 2008, on which Ms. Eisler could have drawn the conclusion that Halo qualified for out-of-network emergency care through June 30, 2008.   None of the treatment notes, nothing in the claim file, and no exhibit filed in support of any of the briefing by either party indicates that, at the time Ms. Eisler allegedly extended YHP's initial referral, any physician or other medical expert opined that Halo suffered from an acute medical condition requiring urgent or emergency medical care, necessitating treatment by a physician or hospital outside the YHP network.

Eight days later, on August 15, 2008, YHP sent Halo a letter in response to her "appeal [of] a decision by Yale Health Plan to deny coverage for portions of

the care [she] received out of network on June 17, 2008 at the office of Dr. Donald

D'Amico." [Dkt. #38-12, Ex. J at 1].  The letter explained that Halo's "claim ha[d]

been reviewed in detail by [YHP's] Medical Director, Dr. Michael Rigsby along

with the Chief of Ophthamology, Dr. Susan Forster." [*Id.*]  It then stated that,

although Halo "elected to leave the New Haven area" and "[t]he services provided

by Dr. D'Amico went beyond consultation, resulting in charges that were not

covered," YHP decided to "attempt to negotiate with Cornell Opthamology

Associates a payment based on usual and customary charges for the services

provided," because Halo "or Dr. Liggett[7] may not have fully understood in

advance the limited nature of the approved referral." [*Id.* at 1-2].  Notwithstanding

this attempt to negotiate the charges Halo had incurred, the letter stated that "the

original decision to deny coverage for care with Dr. D'Amico beyond the visit on

June 17th was correct." [*Id.* at 2].

On September 8, 2008, Halo again wrote YHP's Manager of Claims,

regarding her "First Level Claim Appeal." [Dkt. #38-13, Ex. K, at 1].  Halo

explained that her letter was "to serve as a formal response to [YHP's] letter of

August 15, 2008 in which [YHP] denied the appeal under the Yale Health Plan for

care, coverage, and expenses that student and patient Tiffany Halo received . . .

with Dr. Donald J. D'Amico." [*Id.*].  Halo's letter noted "several issues" with

YHP's letter of August 15, including that Dr. Rigsby and Forster, who reviewed

Halo's claim had not "*ever physically examined [Halo].*" [*Id.* (emphasis in

original)].  Halo also took issue with the letter's assertion that Halo "received

---

[7]   In her letter, dated September 8, 2008, Halo notes that YHP likely meant "Dr.
D'Amico" rather than "Dr. Liggett." [Dkt. #38-13, Ex. K at 2].

timely and appropriate care from Yale Health Plan, Yale Eye Center and New England Retina Associates," [*id.*], and the assertion that Halo "elected to leave the New Haven area." [*Id.* at 2]. Halo stated in her letter that her reason for pointing out these and other issues with YHP's August 15 letter was "so that the Claims Review Committee [would be] fully informed of [Halo]'s situation upon secondary examination of her claim." [*Id.*] The same day, September 8, 2008, Halo also sent a letter to YHP's "Claims Review Committee" regarding her "Second Level Claim Appeal." [*Id.* at 3]. This letter tracked the sequence of events Halo described in her August 7 letter. [*Id.* at 3-4].

On September 18, 2008, Moshe Siev, a co-chair of YHP's Claims Committee, wrote Halo to inform her that the "Claims Committee voted to approve payment in full for the office visits on June 17, 2008 and June 18[], 2008." [Dkt. #38-14, Ex. L, at 1].

### f. Halo Continues to Treat with Dr. D'Amico Without Prior Approval from YHP

Throughout the period Halo sought reimbursement for her first two appointments with Dr. D'Amico (on June 17 and June 18, 2008), she continued to treat with him. She attended follow-up visits on June 20 and June 26, 2008. The report concerning her June 20, 2008 visit stated that Halo was experiencing "no pain," that the "[v]isit [t]ype" was a "[f]ollow [u]p [v]isit," and that she had experienced "no pain" the previous day. [Dkt. #38-4, Ex. B, at 28]. However, the report did note that there remained a number of "abnormal[ities]," [*id.* at 29-30], and recommended that Halo "[r]eturn in about 7 days (around 6/27/2008)." [*Id.* at 31]. Halo's report from her June 26, 2008 visit similarly noted that she was "not

having pain any longer." [*Id.* at 32].  However, Dr. D'Amico did observe that "there is a high chance of permanent cataract [in Halo's left eye], and the state of the retina cannot yet be clearly determined." [*Id.* at 34].  Accordingly, he recommended a follow-up appointment in two weeks.  [*Id.*]  Neither of these treatment notes states that Halo had an acute medical condition necessitating urgent or emergency medical treatment.  *Id.*

Rather than come back in two weeks, Halo did not return to Dr. D'Amico's office until more than a month later, on August 5, 2008.  The report from this visit notes that, on July 10, 2008, Halo reported "no change or problems since [her] last visit." [*Id.* at 35].  At her visit on August 5, Halo noted a "round spot" on her left eye and that her right eye was "feeling 'tight'." [*Id.*]  After examining her, Dr. D'Amico recommended that she "[r]eturn in about 7 days (around 8/12/2008)" to undergo certain procedures.  [*Id.* at 38].  Dr. D'Amico's treatment note did not state that the follow-up visit was scheduled to treat an acute medical condition requiring urgent or emergency medical treatment.  *Id.*

The parties dispute whether Halo submitted claims for reimbursement of the cost of her June 20 and June 26, 2008 appointments.[8]  In any event, the parties agree that Halo was informed in November 2008 that YHP had "rej[ected]"

---

[8]  *Compare* [Dkt. #43, Opp. at 18 ("Cornell Billing Opthamology sent the (June 17, 18, 20, 26) bills to YHP Claims electronically and they were received by YHP Claims on June 26, 2008.")] *with* [Dkt. #38, Mot. for J., at 9 n.5 ("The plaintiff never filed a claim for services rendered by Dr. D'Amico on June 20 and June 26, 2008.")].  Although Halo does not cite to any portion of the record in support of her assertion that YHP received bills for the services performed on these days, an "Explanation of Benefits" form sent by YHP in November 2008 lists the amounts Halo was billed for each of the services she received on those days.  *See* [Dkt. #38-19 at Ex. Q].

any claims for service stemming from Halo's June 20 and June 26 appointments, as "[n]ot [a]uthorized."  [Dkt. #38-19, Ex. Q).  There is no evidence that Halo ever appealed any denial of these claims.[9]  In addition, Halo does not seriously challenge YHP's contention that she "never filed a claim with Yale Health Plan" for her August 5, 2008 treatment.  [Dkt. #38, Mot. for J., at 10].[10]

### g.  Plaintiff Undergoes Procedure on August 13, 2008 Coverage for Which YHP Declines

In her letter dated August 7, 2008, Halo informed YHP that she had scheduled a surgery "for next Wednesday, August 13, 2008 with Dr. D'Amico at Cornell Weill Department of ophthalmology."  [Dkt. #38-8, Ex. F at 2].

On August 11, 2008, Dr. Forster, of YHP, called Halo to advise her to stay in network in order for the plan to cover her medical expenses, and she indicated

---

[9]  While Halo appears to contend that she appealed the denial of her June 20 and June 26 claims in her August 7, 2008 letter, *see* [Dkt. #43, Opp. at 16], the letter makes no mention of either of these appointments.  *See* [Dkt. #38-8, Ex. F].  In fact, the substance of the letter makes clear that these appointments were *not* included in her "formal 'first level claim appeal.'"  [*Id.* at 1].  In her letter, Halo asserted that when she spoke with Vicki Eisler the day before (August 6), Eisler stated that, "no official determination [had been] made about the extended referral but [advised her] to put in an appeal to the denied claim."  [*Id.* at 2].  Halo maintains that her June 20 and June 26 appointments were part of "the subsequent monitoring of [Halo]'s ongoing condition" which YHP allegedly agreed to include in its alleged "extension of the referral beyond a second opinion."  [Dkt. #43, Opp. at 15].  Moreover, Halo does not contend that she appealed the November 2008 denial.

[10]  Halo broadly claims that her August 7, 2008 letter "was for all urgent claims denied from June and up to and including the [anticipated] August 13" surgery. [Dkt. #43, Opp. at 19].  Although her letter mentions her August 5, "follow-up appointment," [Dkt. #38-8, Ex. F], as of the date of her letter, Halo had not submitted any claim for her August 5 appointment.   Indeed, at no point did Halo submit any claim for this appointment, nor did she ever receive any written denial from YHP.

that YHP would not pre-authorize the August 13 scheduled surgery.  [Dkt. #38-10 at Ex. H; Dkt. #43, Opp. at 17].  For purposes of this decision, the Court will treat Halo's notification as a request for pre-approval of out-of-network medical care and Dr. Forster's response as an informal denial of approval.

Halo alleges that she told Dr. Foster that, as a result of her condition, she was unable to return to New Haven and that she had experienced a decrease in vision.  [Dkt. #43, Opp. at 17].  In addition, she now alleges for the first time that she "told Dr. Forster about the lack of access [to] emergency treatment at Yale." [*Id.*].  Dr. Forster's contemporaneous notes of this conversation make no reference to any "emergency treatment," whether in or out-of-network, but they do state that Halo "was advised to the YHP need to have her stay in network where equivolent [sic] care could be given," that Halo "was unhappy with this," and that she "plan[ned] to go through with sergery [sic] with [Dr.] D'Amico in NYC inspite [sic] of the YHP denial of coverage."  [Dkt. #38-10, Ex. H].

Notwithstanding her conversation with Dr. Forster, Halo elected to undergo surgery on August 13, 2008 with Dr. D'Amico at New York Presbyterian Hospital. [Dkt. #43, Opp. at 19; Dkt. #38-4, Ex. B, at 43-45].  However, it is unclear whether Halo ever submitted a written claim for this procedure.[11]  *See* [Dkt. #38, Mot. for J., at 33].

---

[11] As was the case with her June 20 and June 26 procedures, the parties dispute whether or not Halo submitted a claim for her August 13 procedure, *see* [Dkt. #38, Mot. for J., at 33; Dkt. #43, Opp. at 19], and the record contains some evidence that a claim may have been submitted.  *See* [Dkt. #38-11 at Ex. I].

Two days later, on August 15, 2008, YHP responded in writing to Halo's letter of August 7, in which Halo initially disclosed her intent to undergo surgery on August 13.  [Dkt. #38-12 at Ex. J].  In its letter, YHP once again stated that it had already provided "clear and explicit" communication to Halo that "further visits and follow-up surgery with Dr. D'Amico would be denied."  [*Id.* at 2].   Halo does not dispute YHP's contention that this letter confirmed YHP's oral denial of Halo's claim for her August 13, 2008 procedure.[12]  [Dkt. #38, Mot. for J., at 12].

The parties agree that Halo appealed this denial on September 8, 2008,[13] [Dkt. #43, Opp. at 19; Dkt. #38, Mot. for J., at 34], and YHP upheld the denial the next day.  [Dkt. #43, Opp. at 19; Dkt. #38, Mot. for J., at 35;  *see also* Dkt. #38-14 at Ex. L].  Halo sought a second appeal of the denial of her August 13 claim on September 29, 2008.  [Dkt. #38-15 at Ex. M].  A week later, YHP informed Halo that it had denied her second appeal.  [Dkt. #38-16 at Ex. N].

### h.  Plaintiff Undergoes a Final Surgery in September 2008 Which YHP Declines to Cover

Following her surgery on August 13, Halo returned to Weill on September 10, 2008 for a follow-up visit.  *See* [Dkt. #38-4, Ex. B, at 46-48].  Halo's examination report states that since her last retina appointment, she was experiencing vision problems.  *See* [*id.* at 46].  Halo was ultimately diagnosed with a recurrent retinal

---

[12]  Indeed, Halo appears to view this August 15, 2008 letter as a denial of her "first level appeal" for all of her claims "from June and up to and including the August 13 emergency surgery."  [Dkt. #43, Opp. at 19].

[13]  Although her letter mainly concerned YHP's decision to continue to deny her June 17 and June 18, 2008 claims, Halo informed YHP's Claims Manager that "this letter is being forwarded to the Claims Review Committee because [Halo]'s surgery on August 13 with Dr. D'Amico was extensive, timely, and medically necessary."  [Dkt. #38-13, Ex. K at 2].

18

detachment, but surgery was not performed on that date.  [*Id.* at 48].  Surgery was scheduled for a week later, September 17, 2008.  [*Id.*].  Halo did not communicate with YHS about this surgery prior to undergoing it.  [Dkt. #38, Mot. for J., at 13-14].  Halo filed a post-service claim for the charges associated with this treatment, which YHP received on October 3, 2008.  *See* [Dkt. #38-18 at Ex. P].  YHP denied Halo's claim on November 7, 2008, reiterating that the reason for the denial was "SERVICE[S] NOT AUTHORIZED."  [Dkt. #38-19 at Ex. Q].  There is nothing in the record establishing that YHP had received any information from a medical professional stating that this surgery was performed because Halo had a sudden and unexpected onset of an acute medical problem or trauma that required immediate medical attention.  Halo never appealed this denial.  *See* [Dkt. #38, Mot. for J., at 13-14].

   i.  **ERISA Regulations**

   The parties agree that the administration of the Yale Health Plan is subject to ERISA and the regulations promulgated thereunder.[14]  29 C.F.R. §2560.503-1 governs an administrator's claims procedures and "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. §2560.503-1 (a).

   For the purposes of ERISA, "a claim for benefits is a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable

---

[14]  YHP expressly informs its beneficiaries that they "are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)."  [Dkt. #38-3, Ex. A at 77].

procedure for filing benefit claims." 29 C.F.R. §2560.503-1(e). Pursuant to 29

C.F.R. §2560.503-1(f)(iii), in connection with pre-service claims,

> [T]he plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 15–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision.

> 29 C.F.R. §2560.503-1(f)(iii)(A).

> In connection with post-service claims,

> [T]he plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision.

> 29 C.F.R. §2560.503-1(f)(iii)(B).

> Regarding urgent care claims,

> [T]he plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claim by the plan, unless the claimant fails to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the plan. In the case of such a failure, the plan administrator shall notify the claimant as soon as possible, but not later than 24 hours after receipt of the claim by the plan, of the specific information necessary to complete the claim. The claimant shall be afforded a reasonable amount of time, taking into account the circumstances, but not less than 48 hours, to provide the specified information.

> 29 C.F.R. §2560.503-1(f)(2)(i).

Under 29 C.F.R. §2560.503-1(g), the administrator is required to provide a written or electronic notification of any adverse benefit determination, and the notification must set forth "in a manner calculated to be understood by the claimant (i) [t]he specific reason or reasons for the adverse determination [and] (ii) [r]eference to the specific plan provisions on which the determination is based." *Id.*

In addition, 29 C.F.R. §2560.503-1(h) provides that the administrator shall provide a "full and fair" review on an appeal of adverse benefit determinations that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."  Administrators of group health plans which provide for two appeals of an adverse determination, like YHP's policy, must provide notification "with respect to any one of such two appeals, not later than 30 days after receipt by the plan of the claimant's request for review of the adverse determination."  29 C.F.R. §2560.503-1(i)(2)(iii)(A).  Lastly, under 29 C.F.R. §2560.503-1(j), the administrator must provide the claimant with written or electronic notification of a plan's benefit determination on appeal that sets forth "in a manner calculated to be understood by the claimant (i) [t]he specific reason or reasons for the adverse determination [and] (ii) [r]eference to the specific plan provisions on which the determination is based."

<u>Legal Standard</u>

While a motion for judgment on the administrative record is a motion that "does not appear to be authorized in the Federal Rules of Civil Procedure," courts treat such motions as motions for summary judgment.  *Muller v. First Unum Life*

*Ins. Co.*, 341 F.3d 119, 124 (2d. Cir. 2003); *see also Guglielmi v. Northwestern Mutual Life Ins. Co.*, No. 06-CV-3431, 2007 WL 1975480, at *3 (S.D.N.Y. July 6, 2007); *Chitou v. Unum Provident Corp.,* No. 05-CV-8119, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007); *Pava v. Hartford Life and Accident Ins. Co.*, No. 03-CV-2609, 2005 WL 2039192, at *6 (E.D.N.Y. August 24, 2005); *Perezaj v. Bldg. Serv. 32B-J Pension Fund*, No. CV-04-3768, 2005 WL 1993392 at *4 (E.D.N.Y. Aug.17, 2005); *Katzenberg v. First Fortis Life Ins. Co.*, No. 05-CV-1146, 2007 WL 1541468, at *14 (E.D.N.Y. May 25, 2007); *Charles v. First Unum Life Ins. Co.*, No. 02-CV-0748E, 2004 WL 963907, at *1 (W.D.N.Y. March 26, 2004).

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

a. __Standard of Review of Plan Administrator's Denial of Benefits__

1. __YHP Was Granted Discretionary Authority to Administer the Plan__

ERISA jurisprudence determines the standard and scope of review in connection with a challenge to a plan's denial of benefits. *Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869 at *6 (S.D.N.Y. 2007). "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996). However, after analyzing the legislative history of ERISA, the Supreme Court has held that a denial of benefits challenge is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 111-12 (2d. Cir. 1995); *Murphy v. IBM Corp.*, 23 F.3d 719, 721 (2d Cir. 1994) (per curiam), *cert. denied*, 513 U.S. 876 (1994); *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 829 (1983).

In order to determine if a plan confers discretionary authority on its administrator(s), the Court must examine the language of the plan. The Second Circuit has held that discretionary authority can be granted without specific trigger words such as "discretion" or "deference," as long as the benefit plan's language is clear. *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005). In general, objective standards do not grant discretion while subjective standards do. The Second Circuit has instructed that subjective

phrases such as "resolve all disputes and ambiguities" or "in our judgment," clearly confer discretionary authority. *Id.*; *see also Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-23 (2d Cir. 2008) (finding that terms such as "may adopt reasonable policies, procedures, rules, and interpretations" and "determine[s] to be the reasonable charge" confer discretionary authority).

However, the Second Circuit has explained that a requirement to "submit satisfactory proof of Total Disability" is ambiguous and does not clearly confer discretionary authority. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251-52 (2d Cir. 1999). The Second Circuit explained that such a phrase is ambiguous because it is unclear whether the claimant must submit to the administrator satisfactory proof which would imply an objective standard of "satisfactory proof," or the claimant must submit proof that is satisfactory to the administrator, which would imply a subjective standard of "satisfactory proof." *Id.* It is the administrator's burden to prove that discretionary authority has been granted. *Id.* at 249.

In this case, the plan clearly reserves discretion for the plan administrator. The plan provides that "YHP may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of the policies and coverage plans described in this handbook." [Dkt. #38-3, Ex. A at 76]. Whether a visit may be characterized as an emergency or not is also explicitly within YHP's discretion, as the plan provides that, "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied." [*Id.* at 63.]. The language of the plan

plainly permits YHP to adopt reasonable interpretations and use their judgment in determining the outcome of particular claims.  Accordingly the plan unambiguously grants discretionary authority to the plan administrator to determine eligibility.  *See Nichols*, 406 F.3d at 108 (finding that "in our judgment" is a phrase clearly granting discretionary authority).

### 2.  Arbitrary and Capricious Review is Appropriate

Once it is clear that the administrator has discretionary authority, the standard of review ordinarily shifts from *de novo* to an arbitrary and capricious standard of review.  *Id.*; *see also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 131 (2d Cir. 2008); *Krauss*, 517 F.3d at 622; *Pastore v. Witco Corp. Severance Plan*, 196 Fed. Appx. 18, 21 (2d. Cir. 2006); *Brockett v. Reed*, 78 Fed. Appx. 148, 150 (2d Cir. 2003); *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  However, the Second Circuit has held that, under certain circumstances, a plan administrator's failure to comply with the letter of the claims procedures outlined in ERISA requires courts to eschew the more deferential arbitrary and capricious review normally applied to an administrator's discretionary decisions in favor of a more searching *de novo* review.  *See Nichols v. Prudential Ins. Co.*, 406 F.3d 98, 109 (2d Cir. 2005).  As the Department of Labor noted in the amicus brief it submitted to the Second Circuit, the *Nichols* court "reasoned that when a plaintiff's benefit claim was 'deemed denied' because the plan had not decided her claim within the applicable time limits there was no 'exercise of discretion' to which to give 'deferential review.'"  Brief of the Acting Secretary of Labor, at 8, Halo v. Yale Health Plan, No. 12-CV-1447 (2d Cir. filed Jan. 31, 2013), 2013 WL

453955 at *20-21.  However, *Nichols* arose under an extreme set of facts that are not applicable here.

   In *Nichols*, the plan administrator failed to even acknowledge the claimant's appeal until after the time period specified by the regulations then in effect had expired.  When the administrator did provide notice of the appeal, it informed the claimant that it would not resolve the appeal until the claimant submitted certain medical records.  The claimant refused to comply with the request and filed suit in federal court.  *See Nichols*, 406 F. 3d at 101-02.  Under this set of facts, the Second Circuit held that it "may give deferential review only to actual exercises of discretion, and that a 'deemed denied' claim is not denied by an exercise of discretion[,] but by operation of law" on the day after the regulations require a decision be issued.  *Id.*

   Given the unique facts under which the Second Circuit decided *Nichols*, when faced with the question of whether an administrator's failure to comply with ERISA claims procedure is sufficient to trigger *de novo* review, district courts in this Circuit conduct a fact-specific inquiry to determine whether the plan administrator had acted in a dilatory or bad faith manner such that a claimant's claim is "deemed denied," or if the administrator made efforts to keep the beneficiary apprised of the claim assessment process and delivered reasonably timely and detailed decisions, which indicate that the administrator validly exercised its discretion.  *See, e.g., Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 336-40 (E.D.N.Y. 2013); *Tsagari v. Pitney Bowes, Inc. Long-Term Disability Plan*, 473 F. Supp. 2d 334, 338-40 (D. Conn. 2007); *Wedge v. Shawmut Design &*

26

*Constr. Grp. Long Term Disability Ins. Plan*, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at *9-11 (S.D.N.Y. Sept. 10, 2013); *Duncan v. Cigna Life Ins. Co. of N.Y.*, No. 10-CV-1164 (SJF)(ARL), 2011 WL 6960621, at *4-5 (E.D.N.Y. Dec. 30, 2011); *Onge v. Unum Life Ins. Co. of Am.*, No. 3:07-CV-01249(AWT), 2010 WL 3802787, at *2-4 (D. Conn. Sept. 20, 2010); *Robinson v. Metropolitan Life Ins. Co.*, No. 06 Civ. 7604, 2007 WL 3254397, at *2 (S.D.N.Y. Nov. 2, 2007); *Pava v. Hartford Life & Accident Ins. Co.*, No. 03 CV 2609 SLT RML, 2005 WL 2039192, at *8-9 (E.D.N.Y. Aug. 24, 2005).[15]

Here, while YHP's communications of its claim denials were not ideal (and in some instances failed to comply with ERISA regulations), the substance and timing of its denials of Halo's claims were sufficient to indicate that YHP had exercised its discretion, such that this Court will review its denials of Halo's claims under an arbitrary and capricious standard. *See Topalian*, 945 F. Supp. 2d 294, 337 (E.D.N.Y. 2013) ("[T]he weight of authority in the Second Circuit supports

---

[15] Citing to one district court opinion in this Circuit, *Burke v. Price WaterHouseCoopers LLP Longer Term Disability Plan*, 537 F. Supp. 2d 546 (S.D.N.Y. 2008), Halo contends that "substantial compliance with regulatory deadlines is insufficient and claim administrators must strictly abide by the time line set forth in the regulation." [Dkt. #43, Opp. at 31]. While *Burke* does construe *Nichols* as holding "that 'substantial compliance' with regulatory deadlines is insufficient," that "[i]f a claim administrator misses a deadline, the claim is deemed denied and . . . a 'deemed denied claim' is subject to *de novo* review," *Burke*, 537 F. Supp. 2d at 551, the Second Circuit subsequently clarified that it "has not yet definitively adopted or rejected the substantial compliance doctrine." *Duncan v. CIGNA Life Ins. Co. of New York*, 507 Fed. Appx. 61, 65 (2d Cir. 2013). Indeed, the Second Circuit has, post-*Burke*, held that, with regard to at least some of the ERISA procedural requirements, substantial compliance is sufficient. *See Testa v. Hartford Life Ins. Co.*, 483 Fed. Appx. 595, 597 (2d Cir. 2012) ("Substantial compliance with the regulations is all that is needed to constitute 'adequate notice' under ERISA.") (applying arbitrary and capricious review).

the application of arbitrary and capricious review where . . . the plan administrator remains in regular contact with the benefits claimant and issues a decision prior to the commencement of federal litigation.")

With regard to Halo's first two out-of-network treatments, on June 17 and June 18, 2008, YHP communicated with Halo throughout the claim process.  YHP spoke with Halo on June 17 *before* she underwent the procedures.  *See* [Dkt. #38, Mot. for J., at 8; Dkt. #43, Opp. at 13].  YHP reaffirmed the scope of its out-of-network referral in writing the same day (June 17).  *See* [Dkt. #38-5 at Ex. C].  Plaintiff alleges that YHP spoke with her father on either June 17 or 18.  *See* [Dkt. #38-8, Ex. F at 2; Dkt. #43, Opp. at 14; Dkt. #43-8, Ex. V (Aff. of Hal Halo) at ¶3].

Once Halo submitted formal post-service claims for these visits, YHP complied with the ERISA notification requirements.  YHP received Halo's claim on July 8, 2008, *see* [Dkt. #38-6 at Ex. D], and issued an initial written denial on July 30, 2008.  [Dkt. #38-7 at Ex. E].  YHP's initial written denial of Halo's claims came within ERISA's 30-day requirement for post-service claims.  *See* 29 CFR § 2560.503-1(f)(2)(iii)(B).

While Halo adamantly maintains that she and her family communicated to YHP that her condition was an emergency or was otherwise urgent, [Dkt. #43, Opp. at 14], and YHP does not expressly dispute this contention, simply stating that a condition or procedure is an "emergency" does not convert a claim for benefits into an "urgent care claim" under ERISA.  Urgent care claims are limited to claims in which the application of the time periods for making non-urgent care determinations "[c]ould seriously jeopardize the life or health of the claimant or

the ability of the claimant to regain maximum function," 29 CFR § 2560.503-1(m)(1)(i)(A) or where, "[i]n the opinion of a physician with knowledge of the claimant's medical condition, would subject to the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim."  29 CFR § 2560.503-1(m)(1)(i)(B).  In addition, ERISA provides that, unless a physician with knowledge of the claimant's medical condition determines that a claim is urgent, the decision of whether a particular claim is urgent is to be made "by an individual acting on behalf of the plan applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine."  29 CFR § 2560.503-1(m)(1)(ii).  Halo does not state—and there is no evidence in the record to suggest—that, at the time of either her treatment or the submission of her claim, any physician with knowledge of her medical condition had determined that *any* of her out-of-network procedures constituted urgent claims under ERISA.

> ### a.    Sufficiency and Timing of Benefit Determinations

Although YHP's initial written denial met the timing requirements under ERISA, the Court finds that the notification itself falls short of ERISA's requirements.  Under ERISA, a notification of any adverse benefit determination must communicate, "in a manner calculated to be understood by the claimant . . . [t]he specific reason or reasons for the adverse determination."  29 CFR § 2560.503-1(g)(1)-(g)(1)(i).  The notification must also make "[r]eference to the specific plan provisions on which the determination is based," 29 CFR § 2560.503-1(g)(1)(ii), and it must describe "the plan's review procedures and the

time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review."  29 CFR § 2560.503-1(g)(1)(iv).  The "Explanation of Benefits" form YHP sent Halo provides only the following explanation for YHP's denial of her June 17 and June 18 claims: "REJ – SERVICE NOT AUTHORIZED."  [Dkt. #38-7, Ex. E].  Without more, this explanation does not sufficiently communicate the "specific reason or reasons" for YHP's denial.  29 CFR § 2560.503-1(g)(1)(i).  The form also failed to reference specific plan provisions and to state the plan's review procedures.  *See* 29 CFR § 2560.503-1(g)(1)(ii)-(iv).

However, YHP's second letter, denying Halo's August 7, 2008 "first level claim appeal," [Dkt. #38-8, Ex. F at 1], cured some of these defects, by explaining the basis for YHP's denial and notifying Halo of her right to appeal, and it also put Halo on notice about subsequent claims for out-of-network treatment in connection with her eye condition.  *See* [Dkt. #38-12 at Ex. J].  First, YHP explained the basis for its denial of the claims, stating that Halo "elected to leave the New Haven area and requested coverage for a second opinion with a[n] [out-of-network] physician," that "[c]overage for non-emergency out of network care is not part of [Halo's] health care benefit with Yale Health Plan," that while Halo's request for a second opinion had been approved, "[t]he services provided by Dr. D'Amico went beyond consultation, resulting in charges that were not covered by the original request."  [*Id.* at 1].  The letter then referenced the recent conversation YHP had with Halo on August 11, 2008, in which Dr. Forster advised

Halo to stay in network in order for the plan to cover her medical expenses, [Dkt. #38-10 at Ex. H], stated that "further visits and follow-up surgery with Dr. D'Amico would be denied, based on the terms of [Halo's] coverage," and reminded Halo "of the availability of in-network retinal specialists to provide [her] needed follow up care." [Dkt. #38-12, Ex. J at 2]. The letter further advised Halo to "contact Dr. Forster regarding [her] options for follow up care." [*Id.*]. Finally, it informed Halo that she was "entitled to further review [her] appeal with the Claims Review Committee as described in [YHP's] member handbook," and stated that in the event Halo wished to pursue an appeal, she should "contact Vicki Eisler . . . for information and assistance." [*Id.*]. Accordingly, the August 15 letter satisfied the "fundamental purpose of these procedural requirements [which] is to insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *Alternative Case Sys. v. Metropolitan Life Ins. Co.*, No.92Civ.7208(RPP), 1996 WL 67737, at *2-3 (S.D.N.Y. Feb. 16, 1996); *see also Testa v. Hartford Life Ins. Co.*, 483 Fed. Appx. 595, 597 (2d Cir. 2012) ("Substantial compliance with the regulations is all that is needed to constitute 'adequate notice' under ERISA."); *Schnur v. CTC Communications Corp. Group Disability Plan*, 413 Fed. Appx. 377, 380 (2d Cir. 2011) (finding that plan's notice complied 29 C.F.R. §2560.530-1(g) because the "notice of denial—a thorough, four-and-a-half-page document—amply laid out the basis for the denial, and, by implication, a description of those materials necessary to perfect the claim. Specifically, that notice informed [plaintiff] that 'we do not see any evidence in the current medical records to establish that your

31

condition imposes a physical or psychological impairment that would preclude you from engaging in the substantial and material duties of your regular occupation on a sustained basis.'").

On September 8, 2008, Halo sought a second and final appeal of these two claims, *see* [Dkt. #38-13 at Ex. K], and ten days later, on September 18, 2008, YHP sent Halo a written notice informing her that YHP voted to approve the payment, [Dkt. #38-14 at Ex. L], well within the 30-day ERISA notification period.  *See* 29 CFR § 2560.503-1(i)(2)(iii)(A).

Halo alleges that YHP was "51 days delinquent" in issuing its "denial of benefits for (June 17, 18)."  [Dkt. #43, Opp. at 19].  Halo appears to have arrived at this figure by calculating the number of days between the date she first orally requested an out-of-network referral, June 16, 2008, and August 6, 2008, the day Halo alleges she received YHP's notice denying her claims for the out-of-network treatment.  This calculation is incorrect for at least three reasons. First, there is no dispute that the only pre-service approval Halo requested on June 16 was for a second opinion, *see* [*id.* at 13], and YHP approved this request the next day. Second, even under Halo's calculation, YHP would have had to provide written notice of its denial by July 17, at the earliest, for a post-service claim.  Thus, at most, YHP's denial letter was 20 days late.  Third, and most importantly, this allegation hinges on the conclusion that an oral request for authorization, which did not comply with YHP's claim procedures, constituted a claim for benefits under ERISA.  This is not correct.  YHP required claimants (or their treating doctors) to submit itemized billing statements as part of a claim for benefits.  *See*

[Dkt. #38-3, Ex. A at 39].  Halo complied with these requirements and YHP received these billing statements on July 8, 2008.  *See* [Dkt. #38-6 at Ex. D].[16] Since the ERISA notification requirements are triggered upon an administrator's "*receipt of [a] claim*," 29 CFR § 2560.503-1(f)(2)(iii)(B) (emphasis added), and ERISA defines a claim as "a request for a plan benefit or benefits made by a claimant *in accordance with a plan's reasonable procedure for filing benefit claims*," 29 CFR § 2560.503-1(e), the timing requirements under ERISA did not begin until July 8, 2008.  *See, e.g., Baackes v. Kaiser Foundation Health Plan, Inc.*, 990 F. Supp. 2d 228, 239 (N.D.N.Y. 2014) (declining to apply *de novo* review and holding that ERISA 90-day timing requirement was not triggered because the document upon which the claimant relied was not "an actual formal claim").  Accordingly, YHP had until August 8, 2008 to notify Halo of its denial of her claims—which Halo admits YHP did.  *See* [Dkt. #43, Opp. at 18 ("The June 17 [and] 18 claims were processed by Yale on July 30, 2008, and the denial was received by [Halo] via mail on August 6, 2008.")].  Halo's assertion that YHP was "86 days delinquent" when it notified her in September 2008 that her claims had been approved, [*id.* at 19-20], similarly misses the mark. This figure is based on the approximate numbers of days in between the date of Halo's first procedure

---

[16]  Halo alleges that YHP received the bills on June 26, 2008, based on the date listed on the claim form.  *See* [Dkt. #43, Opp. at 18-19; Dkt. #38-6, at Ex. D]. However, this date appears to be the date on which Halo "authorize[d] the release of any medical or other information necessary to process [her] claim," [Dkt. #38-6, Ex. D at 1 and 2], and when Dr. D'Amico certified that the statements contained in the claim form were accurate, [*id.*], not necessarily the date on which YHP received the claim form.  [*Id.*].  YHP's processing stamp, which appears on each page of the claim form, plainly indicates that this claim was received by YHP's Claims Department on July 8, 2008.  [*Id.*].

(June 17) and the date on which YHP's review committee met for Halo's second appeal (September 9).

Turning now to Halo's next two procedures, June 20 and June 26, 2008, Halo maintains that YHP did not render a benefits decision on her claims until November 11, 2008.  [Dkt. #43, Opp. at 19].  However, the Court is unable to assess whether or not YHP violated the procedures because there is no evidence in the record as to when Halo submitted these claims.[17]  The Court does, however, note that the denial notice YHP issued in connection with both of these claims suffers from the same deficiencies as the initial notice Halo received regarding her June 17 and 18 claims.  *Compare* [Dkt. #38-7 at Ex. E] *with* [Dkt. #38-19 at Ex. Q].

Halo next complains that YHP did not provide timely notice of its denial of her claim for surgery on August 13, 2008.  Indeed, Halo alleges that YHP was "116 days delinquent" in denying her claim for this procedure.  [Dkt. #43, Opp. at 20].  Halo also maintains, as she did with regard to her previous procedures, that YHP was required to comply with the accelerated notification requirements ERISA prescribes for urgent care claims.  [*Id.*]  However, as noted, Halo's and her parents' characterizations of this procedure as an emergency or urgent are not sufficient to trigger YHP's duty to comply with the ERISA urgent care timing requirements, *see supra* at 28, and after considering the other evidence in the

---

[17]  **Halo states that Weill sent the bills electronically, [Dkt. #43, Opp. at 18] and YHP produced an "Explanation of Benefits" form in November 2008 which lists the amounts Halo was billed for each of these services, [Dkt. #38-19 at Ex. Q], but neither this document, nor any other evidence, indicates when YHP received Halo's claims.**

record, the Court finds that YHP's decision not to treat Halo's August 13 claim as a claim involving urgent care was not unreasonable.

In addition, YHP complied with the non-urgent timing requirements. Halo first informed YHP of her upcoming August 13 surgery in her letter of August 7, which appealed the initial denial of her June 17 and 18 procedures. *See* [Dkt. #38-8, Ex. F at 2]. Within eight days, YHP had provided both an oral notification informing Halo of "YHP['s] denial of coverage" for the surgery, [Dkt. #38-10, Ex. H; Dkt. #43, Opp. at 17], and a follow-up letter, which both parties understood conveyed a denial of coverage for Halo's August 13 surgery. *See* [Dkt. #38, Mot. for J., at 12; Dkt. #38-12 at Ex. J; Dkt. #43, Opp. at 19]. Accordingly, YHP satisfied its timing of notification requirements, regardless of whether Halo's claim was construed as a pre-service or post-service claim. *See* 29 CFR § 2560.503-1(f)(2)(iii)(A)-(B).[18] The August 15 letter served as an adequate, though imperfect, denial letter, which reiterated Dr. Forster's oral explanation for the denial of Halo's claim for surgery on August 13 and provided her with information concerning her right and ability to appeal the denial. *See* [Dkt. #38-12, Ex. J at 2].

---

[18] Indeed, as YHP points out, the record does not contain an itemized bill for Halo's August 13 surgery, *see* [Dkt. #38, Mot. for J., at 33], nor does Halo contend that she or Weill ever submitted one. The uncertainty of when or if Halo filed a valid claim in accordance with YHP's and the ERISA procedures serves as an additional basis for declining to apply a less deferential standard of review. *See, e.g., Medina v. Anthem Life Ins. Co.*, 983 F. 2d 29, 33 (5th Cir. 1993) ("[Claimant] may not make her first claim . . . in this lawsuit but must follow proper procedures in filing a claim . . . Since she has not exhausted her administrative remedies, the magistrate judge correctly dismissed her complaint."); *Estate of Hale ex rel. Hale v. Prudential Ins. Co. of America*, 597 F. Supp. 2d 174, 180-81 (D. Mass. 2008) ("Failure to submit a claim at all is normally a failure to exhaust administrative remedies.").

YHP also dealt with each of Halo's appeals of this claim in a timely manner under the ERISA provisions.  *See* [Dkt. #38-13-15 at Exs. K-M].

Finally, YHP timely handled Halo's claim for surgery she underwent on September 17, 2008.  YHP received her post-service claim on October 3, 2008, *see* [Dkt. #38-18 at Ex. P], and issued a written denial on November 7, *see* [Dkt. #38-19 at Ex. Q], within the 30-day time period mandated by ERISA.  *See* 29 CFR § 2560.503-1(f)(2)(iii)(B).[19]  However, once again, YHP provided Halo with a facially deficient denial notice.  *See* [Dkt. #38-19 at Ex. Q].

Although the Court is troubled by some of the sparse denial notices YHP issued in response to some of Halo's claims, YHP's overall course of conduct, which included pre- and post-service telephone conversations with Halo, a detailed denial letter setting forth the reasons for YHP's denials of Halo's June 17 and 18 and August 13 claims and providing Halo with the information necessary for her to pursue her administrative appeals, YHP's timely handling of Halo's appeals, and the uncertainty of if and when Halo submitted claims that complied with YHP's claims procedures, lead to the conclusion that, while YHP did not behave perfectly, "the instant case is not *Nichols*."  *Wedge v. Shawmut Design & Constr. Grp. Long Term Disability Ins. Plan*, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at *9 (S.D.N.Y. Sept. 10, 2013) (applying arbitrary and capricious standard even when plan administrator issued a final appeal decision after plaintiff had filed his suit in court where the administrator "exchanged substantial

[19]  Notably, Halo does not dispute YHP's contention that nobody communicated to YHP that this procedure was emergent or urgent.  *See* [Dkt. #38, Mot. for J., at 13-14 ("Nothing was communicated to Yale Health Plan that this treatment and surgery was emergent or urgent.")].

36

communications with [p]laintiff" and demonstrated efforts to efficiently resolve plaintiff's administrative appeal). Taking into consideration all of the circumstances, by providing Halo sufficient and timely information of its benefit determinations and the reasons therefore, YHP complied sufficiently with the notification requirements such that its decisions are entitled to arbitrary and capricious review.

### 3.  Arbitrary and Capricious Standard of Review

A decision that is arbitrary and capricious will not be upheld and is defined as "without reason, not supported by substantial evidence or erroneous as a matter of law." *Kinstler*, 181 F.3d at 249 (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'"  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  "This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker."  *Burgio v. Prudential Ins. Co. of America*, Np.06-CV-6793, 2011 WL 4532482, at *4 (E.D.N.Y.  Sept. 26, 2011) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) and *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).

In addition, courts have held that where a plan administrator both evaluates and pays benefits claims out of its own pocket, the administrator has a conflict of

interest that must be taken into account in a court's review under an arbitrary and capricious standard.  The conflict of interest analysis was articulated by the Supreme Court in *Glenn*.  *Metropolitan Life Ins. Co. v. Glenn*., 128 S.Ct. 2343, 2349 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court … Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.   We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.") (citations omitted).

A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of "several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials."  *McCauley*, 551 at 133.  The Court must "determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, 'perhaps to the vanishing point.'"  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir.2010) (citation omitted).  The Second Circuit has further instructed that:

> The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood that [the conflict] affected the benefits decision.  'The conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits

**decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.'**

*Durakovic*, 609 F.3d at 139-140 (quoting *Glenn*, 128 S.Ct. at 2351).

<u>Analysis</u>

a. <u>Out-of-Network Consultation and Treatment on June 17 and June 18, 2008</u>

To the extent Halo continues to press for reimbursement of her claims for the June 17 and June 18, 2008 visits to Dr. D'Amico, both parties agree that YHP agreed to pay these claims.  *See* [Dkt. #38, Ex L; Dkt. #43, Opp. at 19].  Thus, Halo's complaints about the earlier denial of these claims are moot.  *See Finkel v. Alltek Sec. Sys. Grp., Inc.*, No. 10-CV-4887 (DLI) (VVP), 2011 WL 4543495, at *1 n.2 (E.D.N.Y. Sept. 29, 2011) (noting that a "claim is moot where defendant paid amount demanded")

b. <u>Halo's Claims for Out-of-Network Procedure Performed on August 13, 2008</u>

The parties agree that Halo exhausted her administrative remedies in connection with her August 13, 2008 claims.  *See* [Dkt. #38, Mot. for J., at 24; Dkt. #43, Opp. at 23-24].  Therefore, these claims are properly before this Court.  As stated above, the Court will consider whether YHP's denial of coverage for the August 13, 2008 procedure was arbitrary and capricious.  *See supra* at 37.

Under the clear and express terms of the plan, Halo would only be entitled to reimbursement for the services provided by an out-of-network physician under

two exceptions.  First, where the care is for an emergency or urgent condition, and second, where the care has been arranged in advance by a YHP clinician and approved by YHP's Care Coordination Department.  *See* [Dkt. #38-3, Ex. A at 58, 68].

It is undisputed that YHP had not pre-approved the August 13, 2008 surgery.  *See* [Dkt. #38, Mot. for J., at 12; Dkt. #43, Opp. at 17].  Accordingly, the only way Halo would have been entitled to coverage for her August 13 procedure is if the procedure was necessary to treat an emergency or urgent condition. There is ample evidence in the record to support YHP's ultimate determination that the August 13 treatment was not for emergency or urgent care.

First, the record indicates Halo knew over a week in advance of the August 13 procedure.  *See* [Dkt. #38-4, Ex. B at 38].   At her previous out-of-network appointment on August 5 (for which Halo never submitted a claim), the examining doctor's report recommended that Halo "return in about 7 days (around 8/12/2008)" to undergo retinal detachment surgery.  [*Id.*]  Aware of this upcoming procedure, Halo notified YHP by letter on August 7, 2008—six days before the procedure.  *See* [Dkt #38-8, Ex. F at 2].  The timing of the procedure, alone, strongly suggests that, while medically necessary and time-sensitive, the August 13 procedure was not an emergency or urgent procedure.  *See, e.g., Smiley by Smiley v. Westby*, No. 87 Civ. 6047 (LAP), 1994 WL 519973, at *11 (S.D.N.Y. Sept. 22, 1994) (noting that a "previously scheduled" consultation "was not an emergency visit").

40

Second, the records from Halo's recent appointments with Dr. D'Amico also support a determination that her August 13, 2008 procedure was not an emergency or urgent.  Following Halo's June 17 procedure, her records suggest that her condition was improving.  For instance, the report of her June 20, 2008 visit stated that she had experienced "no pain" the previous day and recommended that Halo "[r]eturn in about 7 days (around 6/27/2008)."  [Dkt. #38-4, Ex. B at 28, 31].  The report of her next visit 6 days later, on June 26, stated that Halo was "not having pain any longer."  [*Id*. at 32].  Although the report also noted that "there is a high chance of permanent cataract [in Halo's left eye], and the state of the retina cannot yet be clearly determined," [*id*. at 34], it contained a recommendation that Halo attend a follow-up appointment in two weeks.  [*Id*.].

After this appointment, Halo did not return to Dr. D'Amico's office for over a month, on August 5, 2008.  *See* [*id*. at 35-38].  The report from this visit stated that, on July 10, 2008, Halo reported "no change or problem since [her] last visit." [*Id*. at 35].  Her condition appears to have worsened since that July 10 follow-up, as the August 5 reported stated that Halo had a "round spot" on her left eye, that her right eye was "feeling tight," and that Halo had a "recurrent inferior [retinal detachment in her left eye] with subretinal bands." [*id*. at 35-37].  Nevertheless, the report recommended that Halo "[r]eturn in about 7 days" for treatment."  [*Id*. at 38].  Taken as a whole, it would not be unreasonable for YHP to have concluded that, while Halo still required additional treatment, her overall condition, particularly her pain and discomfort, had stabilized or improved.  YHP may also have reasonably concluded that the weeks-long gap in between these

appointments, as compared to the near-daily treatment Halo required from May 31 through June 18, [Dkt. #43, Opp. at 9-14], indicated that the gravity, severity and prognosis of her condition had diminished.

Third, YHP's determination that Halo's August 13 procedure with Dr. D'Amico was elective, rather than emergent or urgent, was not arbitrary and capricious.  [Dkt. #38, Mot. for J., at 37-38].  While Halo maintained that she "was unable to travel back to New Haven" for treatment with Dr. Ron Adelman, a YHP in-network clinician, [Dkt. #43-8, Ex. T (Aff. of Tiffany Halo) at ¶¶ 3-4], Halo was already traveling a considerable distance for her out-of-network treatment, from her parents' home in Denville, New Jersey to New York City.  [Dkt. #38-4, Ex. B at 20, 22].  Halo also chose to undergo the procedure despite being informed by YHP beforehand that it would not cover it.  *See* [Dkt. #38-10 at Ex. H].

Against this evidence, Halo offered YHP only hers and her parents' lay medical conclusions that Halo's treatment was urgent or emergent.[20]  *See* [Dkt.

---

[20] Since filing this litigation, Halo has submitted two affidavits, one from her out-of-network doctor who conducted the relevant procedures, Dr. D'Amico, *see* [Dkt. #50 at Ex. Y], and one from Dr. Christine Zolli, who conducted an independent evaluation of Halo's medical records.  *See* [Dkt #43-8 at Ex. X].  Dr. D'Amico's March 7, 2014 affidavit states that Halo's "condition necessitated" the August 13, 2008 and September 17, 2008 surgeries, which constituted "urgent/emergency medical treatment . . . caused by retinal detachment."  [Dkt. #50 at 2].  Dr. Zolli states in her February 9, 2014 affidavit, her "professional opinion that the eye surgeries performed by Dr. D'Amico were urgent and emergency in nature."  [Dkt #43-8, Ex. X at A-273].  Neither of these affidavits were part of the administrative record before YHP at the time it denied Halo's claims.  Consequently, the Court does not consider them in determining whether or not YHP acted arbitrarily and capriciously when it denied Halo's claims in 2008.  *See Critchlow v. First Unum Life Ins. Co. of Am.*, 340 F. 3d 130, 133 n.2 (2d Cir. 2003) ("The decision whether to consider information outside the administrative record is a discretionary one, even where there is 'good cause.'"); *Suozzo v. Bergreen*, No. 00 Civ. 9649 (JGK), 2003 WL 256788, at *4-7

#43, Opp. at 19, 23].  Neither Halo nor her parents possess the scientific, technical, or other specialized knowledge to opine on whether, or at what point, Halo's eye condition rose to the level of an emergent or urgent condition. *See e.g., Veryzer v. American Intern. Life Assur. Co. of New York*, 547 Fed. Appx. 26 (2d Cir. 2013).   Further, Halo did not consistently describe her August 13 surgery as an emergency or urgent in contemporaneous communications with YHP.  For instance, in her August 7, 2008 letter, Halo informed YHP that she would "need a third surgery to repair the holes in the retina, remove the excess gas, replace the vitreal fluid, and remove []the lens, which now has a cataract, entirely.  The surgery is scheduled for next Wednesday, August 13, 2008 with Dr. D'Amico at Weill."  [Dkt. # 38-8, Ex. F at 2].  Similarly, in her September 8, 2008 appeal letter, Halo states that, in her opinion, the August 13 surgery was "medically necessary: the surgery entailed removal of the lens because of a cataract that had rapidly developed from the perfluoropropane gas, removal of that gas, which still occupied between 33-50% of the volume of her eye after 8 weeks of recovery performed by Dr. Liggett, laser therapy to reattach the retina, and installation of a silicone oil bubble to stabilize recovery."  [Dkt. #38-13, Ex. K at 3].

Halo also did not provide YHP with any quantifiable medical documentation establishing that the services were care for an emergency or urgent condition.

---

(S.D.N.Y. Oct. 20, 2003) (declining to expand the administrative record where plaintiff sought to use the material "to develop new theories and factual bases" before the trial court and noting that courts decline to expand the record "in the majority of cases" where plaintiffs seek to include "additional evidence go[ing] to the claimant's disability *or medical condition*") (emphasis added).

For example, Halo did not submit a letter or other documentation from Dr. D'Amico expressing his medical opinion that the care provided was for an emergency or urgent condition.  In fact, the Court has reviewed all of the medical records that Plaintiff has submitted into the record and there is no mention or indication in any of these records that Dr. D'Amico provided Halo with care for an emergency or urgent condition.  The medical records describe the majority of the services provided by Dr. D'Amico as "follow up visit" and expressly note that Halo had transferred her care to Dr. D'Amico because she was moving to her parents' home in NJ.  *See* [Dkt. #38-4, Ex. B at 22].  There is simply no evidence in Halo's medical records submitted to HYP in support of her claims that she was being provided with care by Dr. D'Amico for an emergency or urgent condition.[21]

Given the substantial evidence in the record to support YHP's conclusions that the services provided by Dr. D'Amico were not care for an emergency or urgent condition and were not pre-authorized, the Court finds that YHP did not act arbitrarily and capriciously when it denied coverage for the August 13 surgery.

### c.  Out-of-Network Treatments on June 20, June 26, and September 17, 2008

While YHP alleges that Halo has failed to exhaust her administrative remedies on her June 20, June 26, and September 17, 2008 claims, *see* [Dkt. #38, Mot. for J. at 25], as explained above, the denial notices YHP issued in connection with each of these claims failed to comply with the ERISA notification

---

[21]  Indeed, the letter Dr. D'Amico prepared in support of Halo's opposition to YHP's initial motion for judgment does not describe *any* of the treatment he provided Halo as urgent or emergent.  *See* [Dkt. #20-20 at Ex. T].  Instead, he characterized Halo's condition in June 2008 as "necessitat[ing] immediate care," and that it "necessitated another vitrectomy on August 13, 2008."  [*Id.*].

requirements.  *See supra* at 34, 36.  Accordingly Halo is deemed to have exhausted her administrative remedies.  *See* 29 CFR § 2560.503-1(l) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan.").  As these claims are deemed exhausted, the Court will now examine each of them under the arbitrary and capricious standard.  *See Montefiore Med. Ctr. v. Local 272 Welfare Fund*, No. 09 Civ. 3096 (HB), 2013 WL 3193397, at *6 (S.D.N.Y. Jun. 25, 2013) (determining that content of denial notices failed to meet ERISA requirements, finding claims deemed exhausted, and reviewing claims under arbitrary and capricious standard).

### 1.   Halo's June 20 and June 26 Claims

There is sufficient evidence in the record to support YHP's denials of each of these claims.  As was the case with Halo's surgery on August 13, these claims arose from treatment Halo received out-of-network from Dr. D'Amico.  Unless these treatments were pre-authorized or were for urgent or emergency care, they were not covered under the plan's express terms.  *See* [Dkt. #38-3, Ex. A at 58, 68].

Halo first argues that these claims were pre-authorized by Vicki Eisler, a YHP employee, during a phone conversation in June 2008.  See [Dkt. #43, Opp. at 15].  Halo alleges that during this call between Eisler and Halo's father, Eisler stated that Halo's "circumstances were 'emergency in nature' and that authorization for extended referral and coverage of benefits would be given for

[Halo's] care with Dr. D'Amico until [June 30, 2008]." [Dkt. #43, Opp. at 14; Dkt. #38-8, Ex. F at 2]. Halo further alleges that Eisler stated "that the necessary paperwork for the [extended] authorization would follow," but that the paper work never arrived. [Dkt. #43, Opp. at 14-15].

In denying coverage for Halo's June 20 and June 26 claims, YHP determined that, despite Halo's allegation, it had not pre-approved coverage of all claims for care with Dr. D'Amico through June 30, 2008. *See* [Dkt. #38, Mot. for J., at 30 n.16]. There is substantial evidence in the record to find that YHP's determination was not arbitrary and capricious.

First, there was no evidence in the record before YHP that would have warranted such an extension. After Halo's initial consultation and procedure on June 17, 2008, her appointment the next day, on June 18, 2008 was for a post-operation, "[f]ollow [u]p [v]isit." [Dkt. #38-4, Ex. B at 25]. The examination summary prepared for that day states that Halo was "feeling much better today after anterior paracentesis yesterday," [*id.*], and the assessment and plan described in the summary did not indicate that Halo required close medical supervision or that she was at risk of sudden and severe health complications. Rather, the assessment portion stated that, while her eye condition continued to present issues, Halo's level of intraocular pressure was "much improved today." [*Id.* at 26]. The treatment plan recommended a "[follow-up] Friday [June 20, 2008] with Dr. D'Amico" in connection with "earlier PRN pain / loss of vision." [*Id.* at 27]. As noted earlier, *see supra* at 14-15, Halo's medical records for both her June

20 and June 26 visits also contained evidence that her eye condition, as of those visits, was not emergent or urgent.

Second, at the time YHP was considering Halo's claim that it had pre-approved coverage for her June 20, June 26, and any other appointments through June 30, 2008, there was substantial evidence before it to support a conclusion that no such agreement had ever been made.  In her August 7, 2008 letter, Halo described the substance of this call and stated that it occurred on "6/17/2008." [Dkt. #38-4, Ex. B at 2].  YHP was aware that on that same day, it had sent to Halo a written referral stating that YHP had authorized "1" visit, for a "2nd opi[nion]," and that this referral was "valid . . . through 06/30/2008," [Dkt. #38-5 at Ex. C], the same end date as the extended referral Halo claimed she received.  Accordingly, based on the record before it, YHP's conclusion that Halo's assertion of an extended referral was incorrect was not arbitrary and capricious.[22]

> 2. September 17, 2008 Claims

YHP's denial of Halo's September 17 claims was similarly not arbitrary and capricious.  First, YHP claims—and Halo does not deny—that she did not receive pre-approval for her September 17 surgery.  *See* [Dkt. #38, Mot. for J., at 13-14]. Second, there is sufficient evidence in the record to support YHP's conclusion that this procedure, while medically necessary, was not an emergency or urgent. Prior to undergoing surgery, Halo had an appointment with a different Weill

---

[22] Halo's recent assertion that the phone call with YHP took place on June 18, not June 17, *see* [Dkt. #43, Opp. at 14, Ex. V at ¶ 3], was not before YHP six years ago, when it denied her claims.  Indeed, the uncertainty of when this call allegedly took place further *supports*—rather than undercuts—YHP's conclusion at that time.

doctor on September 10, 2008.  *See* [Dkt. #38-4, Ex. B at 46].  The summary of this appointment noted that, since her August 13 surgery, Halo "[r]eport[ed] increasing size of black spot in superior visual field and approaching central vision," but, since "last Thursday [September 4, 2008] . . . has stabilized.  No photopsia, floaters, eye pain, or redness."  [*Id.*].  The summary further noted that Halo was "symptomatic for more than one week.  VA is decreased from last visit.  IOP moderately increased from last visit, but no evidence of glaucomatous or corneal changes or pain."  [*Id.* at 48].  Accordingly, the "plan [wa]s to proceed with RRD repair . . . next Wednesday [September 17, 2008]."  Similarly, Halo's pre-operation form, prepared on September 16, 2008, the day before she underwent surgery, stated that her systems were all normal and her rheumatoid arthritis condition was stable.    [*Id.* at 49-52].  The content of Halo's pre-surgical examination reports is sufficient to show that YHP's denial of Halo's September 17 claims was not arbitrary and capricious.

### d.  Out-of-Network Treatments on August 5 and September 10, 2008

Unlike the previous claims the Court has examined, Halo has failed to exhaust her administrative remedies with regard to her August 5 and September 10, 2008 claims, as there is no evidence that she has either filed a claim or that any such claim has been denied.  *See Reid v. Supershuttle Int'l, Inc.*, No. 08-CV-4854 (JG) (VVP), 2010 WL 1049613, at *8 (E.D.N.Y. Mar. 22, 2010) (finding failure to exhaust where "the plaintiffs never formally filed a claim for benefits and were never denied such benefits by . . . the plan administrator").  In addition, Halo's failure to file any claims and the absence of any denials precludes her from

arguing that her failure to exhaust her administrative remedies is excused on futility grounds.  *See Barnett v. Int'l Bus. Machs. Corp.*, 885 F. Supp. 581, 588 (S.D.N.Y. 1995) ("Usually, the futility exception is applied in a context in which there has been, in some form, an unambiguous application for benefits and a formal or informal administrative decision denying benefits . . . [I]f an informal or unsubstantiated denial of a 'claim' that was never filed or formally presented is reviewable in the federal courts, then, in such situations, the courts and not ERISA trustees will be primarily responsible for deciding claims for benefits.")

      e. <u>Civil Penalties</u>

      Although the Second Circuit has not addressed the issue of whether civil penalties are available for violations of 29 C.F.R. § 2560.503-1, several other circuits have held that the civil penalties provided under 29 U.S.C. § 1132(c) apply only to violations of a duty imposed by the ERISA statute and not a duty imposed by regulations promulgated thereunder.  *See e.g., Wilcynski v. Lumbermens Mutual Casualty Co.*, 93 F.3d 397 (7th Cir. 1996) (holding that § 1132 penalties can be assessed only for conduct that breaches an administrator's duty of disclosure created by ERISA subchapter I and that "violations of regulations promulgated thereunder will not suffice.");  *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 147 (3d Cir. 2007) (noting that the Third Circuit has previously "held that the defendants' failure to provide information required by federal regulations did not state a claim under ERISA § [1132](c)(1)" and that "[§ 1132(c)] subjects plan administrators to liability only for failure or refusal to release the information that Subchapter 1 of ERISA" requires) (citing *Groves v. Modified Ret. Plan*, 803 F.2d

109, 111 (3d Cir. 1986)); *see also Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659

(4th Cir. 1996) (holding that civil penalties are available for administrators "who

fail to furnish requested documents that are required to be furnished by §

[1024](b)(4)").

Moreover, several district courts in the Second Circuit have held that §

1132(c) penalties do not apply to violations of agency regulations, and, in

particular, have found that § 1132(c) penalties are not available for purported

violations of 29 C.F.R. § 2560.530-1.   *See e.g., Anderson v. Sotheby's Inc.*

*Severance Plan*, No.04Civ.8180, 2005 WL 1309056, at *4 (S.D.N.Y. May 31, 2005)

(concluding that plaintiff was not entitled to sanctions for plan's alleged failure to

produce requested documents under 29 C.F.R. § 2650.503-1 since "a violation of

ERISA's implementing regulations cannot support the imposition of sanctions

under    section    1132");    *Mohamed    v.    Sanofi-Aventis    Pharmacueticals*,

No.06CIV.1504, 2009 WL 4975260, at *21 (S.D.N.Y. Dec. 22, 2009) (holding that

plaintiff could not recover for plan's alleged violations of 29 C.F.R. § 2560.530-

1(h)(2)(iii), (m)(8) under §1132(c)(1)); *Gill v. Bausch & Lomb Supplemental*

*Retirement Income Plan*, No.09-CV-6043, 2009 WL 3164854, at *4-5 (W.D.N.Y. Sept.

28, 2009) (holding that Plaintiffs could not seek to impose § 1132(c) penalties for

violation of a regulation under 29 C.F.R. § 2650.503-1).

Indeed, in its *amicus curiae* brief, the Department of Labor asserts as much,

citing to *Wilcysnki* and *Groves*, and stating that "the remedies for violations of [§

1133] of ERISA and the claims regulations are the ability to immediately sue in

court under the 'deemed exhausted' provision, and the loss of deferential review

of any decision made in violation of the regulatory requirements.  Neither [§ 1133] nor the regulations provide for monetary penalties, and the penalty in . . . 29 U.S.C. § 1132(c), which Halo cites in her brief, is aimed at violations of the disclosure requirements placed specifically on plan administrators by the statute, not on violations of the claims regulations."  Brief of the Acting Secretary of Labor, at 8, Halo v. Yale Health Plan, No. 12-CV-1447 (2d Cir. filed Jan. 31, 2013), 2013 WL 453955 at *28 n.7.

These courts have reached this conclusion for three reasons: (i) the plain language of §§ 1132 and 1133 of the ERISA statute indicates that Congress viewed the "plan" and the "plan administrator" as two distinct actors with two sets of duties; (ii) the claims procedures with which the plan administrator must comply appear in agency regulations while the civil penalty provision of ERISA authorizes penalties for failure to furnish information required by the statute itself; and (iii) the § 1132 provision providing for civil penalties is penal, rather than remedial, in nature.  *See Wilczynski*, 93 F. 3d at 405-07; *Groves* 803 F.2d at 116-118; *Kollman* 487 at 147 (adopting *Groves*' analysis); *Anderson*, No.04Civ.8180, 2005 WL 1309056 at *4 n.2 (adopting analysis in *Groves* and *Wilczynski* and finding that a contrary case *Zanella* was "in effect overruled"); *Mohamed*, No.06CIV.1504, 2009 WL 4975260, at *21 (quoting *Groves*, *Wilczynski*, and *Anderson*).

On the other hand, a few courts have recognized a gap between duty and liability created by these two sections of ERISA and have closed it by finding that civil penalties may apply to plan administrators who fail to adhere to claims

procedures.  *See Adams v. Cyprus Amax Mineral Co.*, 927 F. Supp. 1407, 1410-1411 (D. Colo. 1996); *Zanella v. Principal Mut. Life Ins. Co.*, 878 F. Supp. 144, 146-47 (E.D. Wisc. 1995); *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F. 2d 618, 623-625 (7th Cir. 1987); *Stone v. Travelers Corp.*, 58 F. 3d 434 (9th Cir. 1995).[23]  In support of this view, these courts have advanced the following reasons: (i) while § 1133 refers only to plans and not plan administrators, the corresponding regulations (29 C.F.R. § 2560.503-1, *et seq.*) specifically address plan administrators; (ii) failure to provide adequate information in response to a claim for benefits constitutes a failure to provide information that is "required" under § 1132(c) of ERISA; and (iii) the civil penalty imposed by § 1132 is remedial, rather than penal.

After reviewing the case law and the ERISA statute as a whole, this Court joins those which have held that civil penalties may be awarded against plan administrators who fail to substantially comply with the claims procedures.  In addition to grounds (i) and (iii), the Court believes that such a holding is the proper one in light of the purposes behind the two sections and ERISA as a whole.

1.    <u>The Principles of Statutory Construction</u>

Before examining the provisions of ERISA, it is important to first consider and articulate the standards governing a court's review of a statute.  The Court

---

[23]  Halo cites to both *Kleinhans* and *Zanella* in support of her claim for civil penalties in this case. As discussed *infra*, the Court agrees that there may be instances where a plan administrator's failure to adhere to the claims procedures articulated in 29 C.F.R. § 2560.503-1 renders them liable for civil penalties under § 1132.  However, the Court disagrees with Halo that civil penalties are appropriate in a case such as this, where an administrator substantially complies with the claims procedures and comports itself in a good faith and non-dilatory manner.

"begin[s] with the understanding that Congress says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quotation and citation omitted). Thus, "[w]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Id.* However, "[w]hether or not words of a statute are clear is itself not always clear." *Tex. State Com'n for the Blind v. U.S.*, 796 F. 2d 400, 406 (en banc).  "[A]bsurd results are to be avoided and internal inconsistencies in the statute must be dealt with." *Id.* (citing *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) and *Commissioner v. Brown*, 380 U.S. 563, 571 (1965)).

A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent.  Consequently, each part or section should be construed in connection with every other part or section to produce a harmonious whole.  Thus it is not proper to confine interpretation to the one section to be construed.  2A N. Singer, *Sutherland Statutes and Statutory Construction* § 46:5 (7th Ed. 2008); *see also U.S. Nat. Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("Statutory construction is a holistic endeavor . . . and, at minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.") (quotations and citation omitted); *Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("In reading a statute we must not look merely to a particular clause, but consider in connection with it the whole statute.") (quotations and citation omitted).  In addition, because it is a court's duty "to give effect, if possible to every clause . . .

of [a] [s]tatute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001), it should avoid construing words or sections of a statute in such a manner as to render them "a practical nullity."  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988).  ERISA is "a comprehensive statute for the regulation of employee benefit plans," *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004), whose sections cannot be read in isolation.  *See, e.g., U.S. v. Morgan*, 118 F. Supp. 621, 691 (S.D.N.Y. 1953) (stating that portions of "one comprehensive scheme of regulation" such as the Securities Act of 1933 and the Securities Exchange Act of 1934 "are to be read together" rather than be treated as "separate, air-tight compartments").

The Supreme Court views ERISA as a "careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."  *Fifth Third Bancorp. v. Dudenhoeffer*, 143 S. Ct. 2459, 2470 (2014).  While Congress sought "to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place," *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quotations and citation omitted), Congress also "desire[d] to offer employees enhanced protection for their benefits."  *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).  Indeed, under certain circumstances, "ERISA's stated purpose of promoting the interest of employees and their beneficiaries" may command measures which raise the risk of "impos[ing] higher administrative and litigation cost on plans." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102-103 (1989).  Mindful of these principles of statutory construction and Congress's

intent when it enacted ERISA, the Court examines sections 1132 and 1133 of ERISA, in order "to give effect to the will of Congress."  *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993).

 2. <u>§ 1132(c) and § 1133 and Its Implementing Regulations Share The Same Purpose: To Ensure That a Beneficiary Receives Adequate Notice From Their Plan Administrator About Their Benefits</u>.

 ERISA's comprehensive legislative scheme includes an integrated system of procedures for enforcement.  *Aetna Health Inc.*, 542 U.S. at 208. ERISA § 1132(c)(1)(B)[24] states, in relevant part:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

 "Congress' purpose in enacting the ERISA disclosure provisions" was to "ensur[e] that the individual participant knows exactly where he stands." *Firestone Tire & Rubber Co.*, 489 U.S. at 103.  To accomplish this aim, Congress fastened a civil penalty in order to incentivize plan administrators and other

---

[24] **The full text of § 1132(c)(1)(B) reads: "Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.  For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.**

fiduciaries to disclose information sought by a claimant or other plan participant. *Id.*; *see also In re Interstate Bakeries Corp.*, 704 F. 3d 528, 534 (8th Cir. 2013) ("The purpose of this statutory penalty is to provide plan administrators with an incentive to comply with the requirements of ERISA and to punish noncompliance.") (quotations and citation omitted).

ERISA § 1133 states:

> In accordance with regulations of the Secretary, every employee benefit plan shall . . . (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

The purpose of these requirements is "to provide claimants with sufficient information to prepare adequately for any further administrative review or for an appeal to the federal courts."  *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009); *accord Moyer v. Metro. Life Ins. Co.*, ---F.3d ---, 2014 WL 3866073 (6th Cir. Aug. 7, 2014); *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008); *Brogan v. Holland*, 105 F.3d 158, 165 (9th Cir. 1997). Indeed, "the notice requirements of subsection (1) help ensure the meaningful review on administrative appeal contemplated by subsection (2)."  *Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 367 (5th Cir. 2013).  To accomplish these aims, ERISA permits the Secretary of Labor to "prescribe such regulations as he finds necessary or appropriate."  29 U.S.C. §

1135.[25] The Secretary has done so, through 29 C.F.R. § 2560.503-1, which were "intended by Congress to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980). Together, § 1133 and its implementing regulations were enacted to supply a beneficiary "with a statement of reasons that, under the circumstances of the case, permit[s] a sufficiently clear understanding of the administrator's position." *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998) (quoting *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994)); *see also Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010) ("The purpose of purpose of these provisions is [to] afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial.") (citations and quotations omitted).

3. **The Absence of Civil Penalties for Violations of § 1133 Deprives § 1133 of the Incentive Structure Present in § 1132 And Renders § 1133 A Practical Nullity.**

If this Circuit were to join those holding that civil penalties are unavailable, plan administrators would be less incentivized to process beneficiaries' claims accurately and efficiently than Congress appears to have intended.

---

[25] ERISA § 1135 provides in full: "Subject to subchapter II of this chapter and section 1029 of this title, the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records (subject to section 1134(a) and (b) of this title."

a.   **The Procedural Remedies Available to Beneficiaries Do Not Adequately Incentivize Plan Administrators to Process Claims Efficiently and Transparently.**

As the Second Circuit recently noted, "the typical remedy" for violations of § 1133 "is remand for further administrative review." *Martin v. Hartford Life and Acc. Ins. Co.*, 478 Fed. Appx. 695, 698 (2d Cir. 2012).  In addition, 29 C.F.R. § 2560.503-1(l) provides that violations of the implementing regulations of § 1133 permit a claimant to immediately pursue her claim in federal court, without exhausting her administrative remedies.[26]  Finally, in cases where the administrator has grossly failed to comply with the ERISA claims procedures, such as in *Nichols*, the court adjusts its standard of review of the denial of benefits, from arbitrary and capricious review (where a plan has conferred discretionary authority upon the administrator) to *de novo* review.  *See supra* at 25.  None of these procedural safeguards are sufficient to incentivize plan administrators for at least three reasons.

First, "the vast majority of Participants whose claims are denied do not sue.  In fact, most do not even appeal the claim internally to a plan administrator." Katherine Vukadin, *Delayed and Denied: Toward An Effective ERISA Remedy For Improper Processing Of Healthcare Claims*, 11 Yale J. Health Pol'y, L. & Ethics 331, 337 (2011).  Indeed, there is evidence that more than 90% of claim denials are

---

[26]  In full, 29 C.F.R. § 2560.503-1(l) states: "Failure to establish and follow reasonable claims procedures.  In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

not appealed through to exhaustion.  *See, e.g.*, Caroline E. Mayer, *The Health Claim Game*, AARP THE MAGAZINE, Nov. – Dec. 2009, at 32, *available at* http://www.aarp.org/health/medicare-insurance/info-09-2009/health_claim_game.html (quoting health care advocate Kevin Lembo as stating that 96% percent of claimants "walk away" from denied claims without appealing).  Given that 7.1% of all healthcare claims are not processed correctly,[27] *see* Am. Med. Ass'n, National health Insurer Report Card (Jun. 17, 2013), *available at* http://www.ama-assn.org/ama/pub/news/news/2013/2013-06-17-national-health-insurer-report-card.page, a considerable number of beneficiaries whose claims were not handled in accordance with § 1133 and its implementing regulations likely did not pursue further administrative or judicial remedies.

Second, when applied, these procedural remedies present little risk to plan administrators.  In the event a court applies the "typical" remedy of remanding the claim back to the administrator for a full and fair review, the effect of such instruction is merely to insist that the administrator "do what they should have done in the first place."  Vukadin, *Delayed and Denied: Toward An Effective ERISA Remedy For Improper Processing Of Healthcare Claims*, 11 Yale J. Health Pol'y, L. & Ethics, at 352.  Moreover, even if the violations are sufficient to get a claimant to court, "the regulatory violation itself usually makes little substantive difference to the outcome," since, at most, it is "conflated" with the court's

---

[27] As recently as 2011, the error rate for private health insurers was <u>19.3%</u>.  See Am. Med. Ass'n, National Health Insurer Report Card (Jun. 18, 2012), *available at* http://www.ama-assn.org/ama/pub/news/news/2012/2012-06-18-national-health-insurer-report-card.page.

conclusion that the administrator's initial denial (or deemed denial) was improper. *Id.* at 351.

Third, even when a court makes the rare decision to apply *de novo*, rather than arbitrary and capricious review, this still may not cure the plan administrator's failure to properly adhere to the ERISA claims procedures.  If sufficiently pervasive, these violations could result in material gaps in the administrative record before it ever gets to the reviewing court.  For example, if a plan administrator fails to adequately articulate the reasons for its denial of a claim, a claimant might have, but fail to submit, information which would materially impact the court's review of the claim.  While a court may, under certain circumstances, consider information outside the record before the administrator, the claimant must first demonstrate good cause, and even then, the decision whether or not to accept some or all of the additional evidence rests soundly within the discretion of the court.

> **b.    The Very Few Substantive Remedies Available For Violations of ERISA Claims Procedures Are Also Insufficient to Deter Plan Administrators.**

While the Second Circuit has previously contemplated the possibility of "substantive harm" caused by "violations of ERISA disclosure provisions," it has resolved its concerns by concluding that a reviewing court may view such violations as "warrant[ing] a finding that the denial was arbitrary and capricious and grant the benefits" that were improperly denied.  *Veilleux v. Atochem N. Am., Inc.*, 929 F.2d 74, 76 (2d Cir. 1991).  However, the uncertainty of whether and how a reviewing court will weigh these procedural violations, and the considerable

likelihood that significant procedural deficiencies will produce substantive harm to claimants above and beyond the value of their claims, appears to warrant providing claimants with additional substantive safeguards (and plan administrators with additional incentives to comply with the ERISA procedures).

**c.**      **None of the Other Provisions of ERISA Incentivize Plan Administrators to Adhere to Reasonable Claims Procedures.**

Federal courts have all but precluded claimants from recovering damages for a plan administrator's failure to comply with claims procedures.  Claimants are expressly prevented from pursuing such damages through breach of fiduciary duty claims under 29 U.S.C. §§ 1104, 1109, and 1132(a)(2).  *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985) (holding that damages under § 1132(a)(2) may be brought only on behalf a plan itself rather than for the benefit of an individual participant).   Similarly, the ERISA "catch-all" provision, § 1132(a)(3)(b), which acts as a "safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy," *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996), has nevertheless proven unhelpful to beneficiaries seeking redress for flagrant violations of claims procedures because compensatory damages, including extra-contractual consequential damages, are not available.  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (determining that compensatory damages are "legal" in nature and thus not recoverable under § 1132(a)(5) which, like § 1132(a)(3)(b), limits recoverable damages to "equitable relief").  Thus, a claimant is limited to bringing an equitable claim, such as a claim for unjust enrichment, which, even if successful, would likely expose the plan or administrator to nothing "beyond the

amount of the denied claim."  Vukadin, *Delayed and Denied: Toward An Effective ERISA Remedy For Improper Processing Of Healthcare Claims*, 11 Yale J. Health Pol'y, L. & Ethics, at 358.[28]

      **4.**    <u>**The Courts Which Have Rejected Civil Penalties for Violations of § 1133 Do Not Explain–Nor Does This Court See–Why Congress Would Have Intended to Impose Upon Plans an Affirmative Duty to Efficiently Administer Benefits But Deprive the Beneficiaries of a Means to Enforce This Duty.**</u>

Those courts which have held that civil penalties under § 1132(c) are unavailable for violations of § 1133 and its implementing regulations appear to have construed each of these sections in isolation, rather than read them together, in light of the aims of ERISA.

First, their heavy reliance on the use of the term "plan" in § 1133 and "plan administrator" in § 1132 appears rigid and hyper-technical, given the nature of the duties articulated in § 1133 and the individual to whom those duties are assigned. ERISA defines an employee benefits plan as "any plan, fund, or program . . . [that] was established or is maintained for the purpose of providing for its participants or their beneficiaries" certain benefits.  29 U.S.C. § 1002(1).[29]  ERISA requires

---

[28]  While an unjust enrichment theory would likely also permit a claimant to recover any cost savings earned by the plan through its administrative non-compliance, such savings, while likely significant, are difficult to quantify. *Id.*

[29]  29 U.S.C. § 1002(1) states in full: "The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship

"[e]very employee benefit plan . . . [to] provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.  29 U.S.C. § 1102(a)(1).[30]  One such fiduciary is the "administrator," whom ERISA defines as "the person specifically so designated by the terms of the instrument under which the plan is operated."  29 U.S.C. § 1002(16)(A)(i).  Since the plan is not a person and is obligated under ERISA to provide adequate notice in writing in support of denials and to provide beneficiaries with a full and fair review of their claims, it is difficult to understand how Congress intended only the plan—and not the plan's administrator—to carry out these duties.  Indeed, as other courts who have found that civil penalties should be available against plan administrators for violations of ERISA claims procedures have already pointed out, the implementing regulations of this section, 29 C.F.R. §2560.503-1, *et seq.*, refer to the "plan administrator" throughout their description of the claims procedure requirements.  *See, e.g.*, 29 C.F.R. § 2560.503-1(f)-(g), (i)-(j).

Second, the close parsing of the language in § 1132(c)(1) that these courts have employed appears to be inconsistent with the aims of the comprehensive nature of the scheme embodied by ERISA and the intended meaning of this

---

funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

[30] 29 U.S.C. § 1102(a)(1) provides: "Every employee benefit plan shall be established and maintained pursuant to a written instrument.  Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."

section.  They construe the phrase, "a request for any information which such administrator is required by this subchapter to furnish," to mean any (and only) information which is specifically referenced in the ERISA statute, ignoring completely any information required by the implementing regulations drafted by the Secretary of Labor for the purpose of accomplishing the aims of ERISA.  They also hold (either explicitly or implicitly) that a "claim for benefits," which the implementing regulations define as "a *request* for a plan benefit," 29 C.F.R. §2560.503-1(e), to fall outside the scope of an actionable request under § 1132(c).  The plain language of § 1132(c) does not appear to compel either of these interpretations, and their effect is to remove any substantive remedy for the failure of a plan or plan administrator to comply with § 1133.

In light of the aims of ERISA, the incongruity of reading § 1133 as imposing duties upon plans and their administrators and § 1132 as failing to provide any remedy for the failure to perform these duties, and the fact that such a construction would essentially render § 1133 a nullity, this Court concludes that civil penalties pursuant to § 1132(c)(1) should be available where a plan administrator fails to substantially comply with claims procedures contained in 29 C.F.R. §2560.503-1.

Conclusion

Based upon the foregoing reasoning, the Court GRANTS the Defendant's motion for judgment on the administrative record as to Plaintiff's June 17, June 18, June 20, June 26, and September 17, 2008 claims. [Dkt. #38].   The Court DENIES the Defendant's motion for judgment on the administrative record as to

Plaintiff's August 5 and September 10, 2008 claims and REMANDS those claims for further administrative proceedings consistent with this decision.  The Clerk is directed to enter judgment in favor of Defendant and close the file.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2014.